Peter J. **BRENNAN**, Secretary of Labor, Petitioner,

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION** and **John J. Gordon Company, Respondents.**

No. 360, Docket 73-1729.

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1974.

Decided Feb. 25, 1974.

---

Donald Etra, Dept. of Justice, Washington, D. C. (Irving Jaffee, Acting Asst. Atty. Gen., and Walter H. Fleischer, Dept. of Justice, Washington, D. C., and Michael H. Levin, Dept. of Labor, Washington, D. C., of counsel), for petitioner.

Submitted by Barth, Sullivan & Lancaster, Buffalo, N. Y. (John J. Sullivan, Jr., Buffalo, N. Y., of counsel), for respondent John J. Gordon Co.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678, is one of many important but as yet rather unfamiliar pieces of federal regulatory legislation enacted in recent years. It requires, § 654, "[e]ach employer" to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees" and authorizes, § 655, the Secretary of Labor to promulgate standards to implement this. The term "employer" is defined, § 652(5), to mean "a person engaged in a business affecting commerce who has employees . . ." Sections 658 and 659 authorize the Secretary to issue citations for violations of the Act, fixing a reasonable time for the abatement of each violation and indicating the penalty, if any, proposed to be assessed. If the employer desires to contest the citation or proposed assessment of a penalty, he is to notify the Secretary and the case is determined by the Occupational Safety and Health Review Commission (OSHRC), whose orders are reviewable, § 660, in the courts of appeals.

Respondent John J. Gordon Company, Inc. (Gordon) is a medium-sized company engaged in sandblasting, painting, masonry contracting, window cleaning and janitorial work on industrial and commercial buildings in the Buffalo, N. Y., area. On August 6, 1971, two employees were painting a building in Buffalo. The citations later issued charged, as has not been seriously challenged, that the scaffold had no horizontal hand rail, no toeboard, no tie-back lines, and no life lines, and that no safety belts were used by the employees. Although the Administrative Law Judge noted that the specific standards, promulgated by the Secretary, which would be violated by these failings, see 29 C.F.R. §§ 1910.28(g)(5); 1910.21(f)(21), (31); 1910.28(g)(9); cf. 1926.107(b), (c), (f), were not effective as against Gordon at the relevant time, he went on to hold, and Gordon does not dispute, that the same failings "constituted a hazard which is generally and commonly recognized as such in the industry in which Gordon was engaged." The scaffold fell; one employee was killed and the other seriously injured. After investigation the Secretary promptly issued two citations which, as amended, proposed a penalty of $1300.

Gordon having served notice of its desire to contest the citations, Administrative Law Judge Harris directed the parties to be prepared to stipulate facts about which there could be no reasonable dispute, including circumstances which would indicate whether Gordon "was engaged in a business affecting commerce." The parties stipulated that the nature of Gordon's business was as indicated above. In the course of the hearing some testimony came in to the effect that Gordon had worked on a Blue Cross building and a Bethlehem Steel plant. Counsel for Gordon made no claim that it was not in a business affecting commerce—an issue which he first presented in proposed findings of fact submitted after the record had been closed.

The Administrative Law Judge, *sua sponte*, reopened the record to take further evidence on this point.[1] At the reopened hearing the Secretary showed, over Gordon's objection but without contradiction, that Gordon supplied services, some on long term service-contracts, to a number of organizations, including McDonald Products Corp. (on whose premises the accident had occurred), Houdaille Industries, Inc., a

---

1. The notice from the Administrative Law Judge crossed in the mail a request by the Secretary for a reopening.

Chevrolet engine plant, Bethlehem Steel, Blue Cross of New York, and Dunlop Tire & Rubber Co., all of which were engaged in interstate commerce, and that it used supplies produced outside New York State although purchased from local suppliers. It is beyond dispute that this evidence was ample to show that Gordon was "engaged in a business affecting commerce"—a phrase often used when Congress means to signal an intention to go beyond the regulation of businesses engaged "in commerce". Construing essentially the same phrase in the National Labor Relations Act, where Congress supplied a definition, § 2(7), the Supreme Court has held that the Act goes well beyond persons who are themselves engaged in interstate or foreign commerce, NLRB v. Fainblatt, 306 U.S. 601, 604–605, 59 S.Ct. 668, 83 L.Ed. 1014 (1939); cf. NLRB v. Vulcan Forging Co., 188 F.2d 927, 930 (6 Cir. 1951); see also United States v. Ricciardi, 357 F.2d 91, 97–98 (2 Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1464, 16 L. Ed.2d 540; 385 U.S. 814, 87 S.Ct. 35, 17 L.Ed.2d 55 (1966) (interpreting the phrase "industry affecting commerce" as defined in the Taft-Hartley Act, 29 U.S.C. § 142(1)). As was said by Congressman Steiger in presenting to the House the Conference Report on the Occupational Safety and Health Act, 116 Cong.Rec. 42199, 42206 (1970):

> The coverage of this bill is as broad, generally speaking, as the authority vested in the Federal Government by the commerce clause of the Constitution.

Throughout the legislative history of the Act, the objective was repeatedly stated to be to make maximum use of the commerce power so that, as was almost as often said, states and employers insist-ing on a high degree of safety should not be disadvantaged by the failure of others to do so. See Sen.Rep.No.91–1282 on S. 2193, 91st Cong. 2d Sess., pp. 4, 22; H.R.Rep.No.91–1291 on H.R. 16785, 91st Cong. 2d Sess., pp. 14–16, 24, U.S.Code Cong. & Admin.News 1970, p. 5177; 116 Cong.Rec. 36509 (Senator Dominick), 36537 (Senator Saxbe), 38369 (Rep. Perkins), 38704 (Rep. Sikes) (1970). Accordingly, the Administrative Law Judge found that Gordon was "engaged in a business affecting commerce." He further found that Gordon had violated its general duty to provide a work place free from recognized hazards, but that only a single serious violation was warranted; thus, he consolidated the two citations, affirmed them as consolidated, and assessed a penalty of $750.

 In addressing the jurisdictional issue, the OSHRC never reached the question of the adequacy of the evidence adduced at the reopened hearing.[2] By a divided vote it held that it was improper for the Administrative Law Judge to have reopened the hearing and that the evidence at the initial hearing was insufficient. Chairman Moran went to great lengths in condemning the reopening, which he thought "so contrary to the impartiality required of persons presiding at adversary proceedings as to amount to a denial of due process of law." Commissioner Van Namee, concurring, while dissociating himself from this characterization, thought the Administrative Law Judge had abused his discretion. Commissioner Burch dissented. He pointed out that the Commission's rules place upon the Administrative Law Judge the duty to "assure that the facts are fully elicited" and empower him to reopen hearings; while

2. Ironically in light of the present posture of the case, it was the Secretary who initially petitioned the OSHRC for discretionary review. He objected to the consolidation of the two violations. OSHRC Chairman Moran's direction of review extended well beyond that issue, however, and included among other things the question "whether the record in this case properly establishes jurisdiction." On the present petition for review, the Secretary does not press his objection to the consolidation of the two violations; he asks only that the Review Commission be instructed "to reinstate the administrative law judge's decision as the Commission's final order."

these rules had not yet become effective at the time of the reopening here at issue, he said they merely "make explicit what was implicit in the interim rules." [3] He thought the majority was subscribing to a "game theory" of administrative adjudication. So do we.

■ It is true, as the majority said, that in reviewing agency refusals to reopen or in passing on applications by a petitioner to present additional evidence to an agency under statutes similar to 29 U.S.C. § 660(a), courts have adopted a very strict standard. But the classic statement of that principle, by, Mr. Justice Jackson in I. C. C. v. Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944), illustrates the distance separating such problems from that with which OSHRC was here confronted. Dealing with a petition for a rate increase which had been pending before the I. C. C. for more than 16 months and on which plenary hearings had been completed more than 13 months before the final order issued, the Court said:

> Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it —always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance

has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body.

Whatever the standard by which we should evaluate an agency's review of the decision of an administrative law judge to *grant* a reopening, it is certainly less severe than that applicable to a court's review of an agency's denial of one.[4]

■ To be sure, the agency itself has an interest in expedition and, if it has no other means to prevent its administrative law judges from indulging in too frequent reopenings, as it should have, it may occasionally be required to reverse an order of reopening. But we cannot think of a case less appropriate than this for the drastic course here taken by the majority of OSHRC. Counsel for Gordon had maintained silence on the jurisdictional issue until the hearing was ended, although he had moved to dismiss on three other grounds; counsel for the Secretary and the Administrative Law Judge could reasonably have thought the point was conceded, especially in light of the stipulation, Gordon's failure to list jurisdiction as among the "issues to be tried" in response to an inquiry in that regard by the Administrative Law Judge, and the

3. We have examined the relevant portion of the *interim rules*, 29 C.F.R. § 2200.21 (1972). It is not altogether clear to us that those of the present provisions on which Commissioner Burch relied were "implicit" in this. Indeed his claim in that regard seems to have rested partly on the fact that the proposed permanent rules were already circulating among those affected, a fact of dubious legal significance and of which we can hardly take judicial notice.

4. Against this, respondents rely heavily on the provision of the Administrative Procedure Act, 5 U.S.C. § 557(b), that "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . ." This cannot change the fact that in the present case, by contrast to the situation in a case such as *Jersey City*, all the evidence sought to be considered is already in the record. Cf. note 7 *infra*.

evidence that Gordon's clients included Blue Cross and the country's second largest steel producer—which even the OSHRC could think might be engaged in interstate commerce.[5] The order of reopening came three months after the hearing and two months after the jurisdictional issue was raised. The reopened hearing apparently was completed in a day;[6] and the evidence could not be controverted.

 The action of the Administrative Law Judge was in line with Judge Hays' well-known admonition to the Federal Power Commission that its role as representative of the public interest "does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission." Scenic Hudson Preservation Conf. v. F. P. C., 354 F.2d 608, 620 (2 Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). See also Landis, The Administrative Process 39 (1938); Richardson v. Perales, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If he had refused to reopen and had dismissed the citation, and OSHRC had affirmed, we might well have ruled this to be the exceptional case where discretion had been so seriously abused as to fall outside the *Jersey City* decision, *supra*, 322 U.S. 503, 64 S. Ct. 1129, 88 L.Ed. 1420.[7] See Cappadora v. Celebrezze, 356 F.2d 1, 5–7 (2 Cir. 1966); cf. Blue Bird Coach Lines, Inc. v. United States, 328 F.Supp. 1331, 1337–1338 (W.D.N.Y.1971). Here, where the Administrative Law Judge had acted properly, it was clearly an

abuse of discretion for OSHRC to reverse him.

Since the record permits only one conclusion on whether Gordon was engaged in a business affecting commerce and it has withdrawn any contest on the merits, we reverse the order of dismissal and remand to OSHRC for the sole purpose of entering a final order enforcing the decision of the Administrative Law Judge.

Reversed and remanded.

---

5. We have no occasion to decide whether that evidence alone would have sufficed.

6. It is somewhat ironical, in light of OSHRC's concern for speed, that more than nine months elapsed between the Chairman's direction for review, see note 2 *supra*, and the date of decision.

7. The standard to be applied in such a case would be a strict one, however. Although the policies demanding a strict standard of review when an agency has refused to re-

open are especially forceful where the request for reopening was based on the alleged staleness of the record, *supra*, they would also pertain to any situation in which additional proceedings would need to be had after an order had come down. Cf. Kentucky Broadcasting Corp. v. FCC, 84 U.S.App.D.C. 383, 174 F.2d 38, 41–42 (1949). This is to be contrasted with the circumstances of the present case, in which all the evidence sought to be considered is already in the record.