513 F.2d 1032
 2 O.S.H. Cas.(BNA) 1641
 Peter J. BRENNAN, Secretary of Labor, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and
Underhill Construction Corporation, Respondents.
UNDERHILL CONSTRUCTION CORP. and Dic Concrete Corp.,
individually and as participants in a joint
venture known as Dic-Underhill, a joint
venture, Petitioners,
v.
Peter J. BRENNAN and Occupational Safety and Health Review
Commission, Respondents.
 Nos. 357, 417, Dockets 74-1579, 74-1568.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 31, 1975.
Decided March 10, 1975.
 
 Eloise E. Davies, Atty., Dept. of Justice (William J. Kilberg, Sol. of Labor, James D. Henry, Deputy Associate Solicitor, Michael H. Levin, Helen Schuitmaker, Attys., Dept. of Labor, Carla A. Hills, Asst. Atty. Gen., Stephen F. Eilperin, Atty., Dept. of Justice, of counsel), for petitioners-cross-respondents.
 William J. Pastore, Sacks, Montgomery, Molineaux & Pastore, New York City, for respondents-cross-petitioners.
 Before MEDINA, OAKES and GURFEIN, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case involves important questions relating to occupational safety in the construction industry. Dic-Underhill, a joint enterprise made up of Underhill Construction Corp. and Dic Concrete Corp., was engaged as a subcontractor[1] in the construction of a high-rise housing project in the Bronx, New York. On November 22 and November 27, 1972, a compliance officer or inspector under the Occupational Safety and Health Act[2] (the Act), Mr. Grudzwick, inspected the partially completed structure and issued certain citations for "serious" and "non-serious"[3] violations of rules setting forth safety standards (29 C.F.R. § 1926.250(b)(1) and § 1926.500(d)(1) ) promulgated under § 655 of the Act by the Secretary of Labor. The Occupational Safety and Health Review Commission (OSHRC) upheld findings by the administrative law judge first of no violation of the nonserious charges based on the inapplicability of 29 C.F.R. § 1926.250(b)(1), which the Secretary petitions us to review, and second of a violation of the serious charge, under § 1926.500(d)(1), which Dic-Underhill petitions us to review. Jurisdiction here lies under 29 U.S.C. § 660.
 
 
 2
 The charge of a "nonserious" violation related to 29 C.F.R. § 1926.250(b) (1), which states that
 
 
 3
 Material stored inside buildings under construction shall not be placed within 6 feet of any hoistway or inside floor openings, nor within 10 feet of an exterior wall which does not extend above the top of the material stored.
 
 
 4
 Two separate incidents were involved in this citation. The first was on the eleventh floor of Bulding C in the housing project, where shoring material consisting of "four by fours," 4 X4 X8', was being stored. That floor in the partially completed structure had neither an exterior wall nor any temporary perimeter guard. The material was stacked in a pile four feet wide and four and one-half feet high, and it extended approximately a foot into space over the edge of the floor. Bricklayers, apparently not employees of Dic-Underhill, were observed several floors below, working on a scaffold directly beneath the overhanging materials.
 
 
 5
 On the fourteenth floor of another building in the project, the OSHA inspector observed a similar situation. There, in a building which was likewise partially completed with no exterior walls or perimeter guards on the upper floors, steel braces were being stored at the edge of the structure. The braces, used to tie in concrete forms, were in stacks of eight about three feet wide and three feet high, and like the shoring material in the other building they extended approximately a foot over the edge. A number of workers were directly below the overhanging braces, but there was no proof that any of these workers were employees of Dic-Underhill. In each instance the materials were purposely stored overhanging the edge in order to facilitate their being hoisted by crane for reuse on other floors.
 
 
 6
 The nonserious violation, which carried with it a proposed $35 penalty, was contested by Dic-Underhill. After hearing, the citation was vacated by the administrative law judge on two grounds. First, he quite remarkably read the standard, 29 C.F.R. § 1926.250(b)(1), as prohibiting only the storing of material within six feet of any hoistway or inside floor openings (emphasis in his original). He thus viewed the standard as intended only "to prevent material from falling into openings in the floors, and not to protect material from falling off the floors and outside the building." Secondly, he found no evidence to demonstrate that Dic-Underhill employees were directly exposed to the hazard contemplated by 29 C.F.R. § 1926.250(b)(1), that is, being injured by falling material.
 
 
 7
 OSHRC review upheld this decision. The petitioning Secretary of Labor argues (1) that the plain language of 29 C.F.R. § 1926.250(b)(1) makes it applicable to the present case, (2) that proof of direct employee exposure to a hazard is not necessary to prove a violation of the Act, and (3) that even if direct exposure was necessary, it was proved here since all employees who must move around a construction site can be said to be directly exposed to a hazard such as the one here involved.
 
 
 8
 The second citation issued to Dic-Underhill concerned a serious violation of 29 C.F.R. § 1926.500(d)(1), which provides
 
 
 9
 Every open-sided floor or platform 6 feet or more above adjacent floor or ground level shall be guarded by a standard railing, or the equivalent, as specified in paragraph (f)(i) of this section, on all open sides, except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a standard toe-board wherever, beneath the open sides, persons can pass, or there is moving machinery, or there is equipment with which falling materials could create a hazard.[4]
 
 
 10
 Three separate incidents involving a violation of this regulation were noted by the compliance officer. On November 22, 1972, inspection on the fifteenth floor of Building D in the housing complex 150 feet above ground found two field engineers, wearing no safety equipment whatsoever, "checking targets"[5] located at the edge of a floor with no perimeter guarding. There was some dispute as to whether the men could have done their work had the perimeter protection been in place,[6] but since this was at most an affirmative defense, under 29 U.S.C. § 661(f) and Fed.R.Civ.P. 8(c), the burden was on the employer to prove that this was not the case, a burden unsatisfied below or here. See NLRB v. Mastro Plastics Corp., 354 F.2d 170, 176-77 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966).
 
 
 11
 On November 27, 1972, while inspecting the seventeenth floor of Building B, 170 feet above ground, Mr. Grudzwick again found no perimeter protection. He also observed a man standing some 15 feet from the edge of the floor who identified himself as a Dic-Underhill employee. There was no conclusive evidence that the man was actually assigned to work on that floor, but the evidence was that he had a hammer in his hand.
 
 
 12
 In an inspection of the eighteenth floor of Building B, 180 feet above ground, also on November 27, 1972, the compliance officer observed two of Dic-Underhill's employees sanding a ceiling with a machine called a Giraffe. The men were working some 10-feet from the edge of the floor, which was at that time open sided. No perimeter guard was present, and the men were wearing no safety belts or other protective equipment.
 
 
 13
 On the basis of these observations, a serious violation of 29 C.F.R. § 1926.500(d)(1) was issued and a penalty of $800 proposed. The administrative law judge upheld the issuance of the citation, but reduced the amount of the penalty to $600. OSHRC review upheld the judge in all respects.[7]
 
 
 14
 The three issues raised by the cross-appeals are as follows:
 
 
 15
 1. Whether the language of 29 C.F.R. § 1926.250(b)(1) (the "nonserious" violation) is sufficiently clear to make it applicable to a situation where, as here, the materials were stacked at the edge of a floor in order to facilitate construction;
 
 
 16
 2. Whether there must be proof both of the existence of a hazard attributable to an employer, and direct exposure to the hazard by the employees of that employer; and
 
 
 17
 3. If so, whether that proof was met by the facts presented here in connection with the "serious" violation of 29 C.F.R. § 1926.500(d)(1).
 
 
 18
 The question of the coverage of 29 C.F.R. § 1926.250(b)(1) is easily disposed of. The administrative law judge's finding that the standard had application only to prevent material from falling into interior openings in floors is clearly erroneous. The standard quite plainly states that "Material stored inside buildings under construction shall not be placed within 6 feet on any hoistway or inside floor openings, nor within 10 feet of an exterior wall which does not extend above the top of the material stored" (emphasis added). The plain language of the regulation refers to the situation here, where a hazard was created by Dic-Underhill, a hazard involving the likely possibility that material could fall from the exterior of a building. Only the narrowest reading of the standard, a reading which we are not prepared to give, would lend any credence to Dic-Underhill's argument that the materials in question were not "stored" since they were going to be reused. All construction materials are "stored" until they are incorporated in the building or reused. We similarly reject their argument that the regulation could be violated with impunity because it interfered with their construction practice. Congressional authority to the Secretary of Labor was broad enough, 29 U.S.C. § 655(a), (b), and when viewed in connection with available remedies by way of individual administrative variances, § 655(d), or judicial review of the standards, § 655(f), this defense must be rejected here. Moreover, even if the employer could raise this defense, on this record he did not meet his burden of showing that other means, e. g., strapping, chains, harnesses or the like, were not useable to permit ready crane removal of the shoring or steel braces.
 
 
 19
 We turn then to the important question whether a violation of the Act requires in addition to proof of the existence of a hazard, evidence of direct exposure to the hazard by the employees of the employer who is responsible for the hazard. Dic-Underhill, needless to say, supports the narrowest reading of the Act, a position that has been supported in several decisions of the Review Commission and by the Fourth Circuit in Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255 (4th Cir. 1974), that 29 U.S.C. § 654(a)(1)[8] should be read to require that only where employees of the cited employer are directly affected by or exposed to noncompliance with one of the Act's standards can the employer be held in violation of the Act. In City Wide Tuckpointing Service Co., CCH Emp. Safety & Health Guide (1971-73 vol.) P 15,767 (1973), for example, an employer was issued a citation for failing to use a required mesh screen between the toe board and guardrail of a scaffold under which persons were required to work or pass, 29 C.F.R. § 1910.28(a)(17). Since there was no evidence that any employee of City Wide worked or passed under the scaffold, the Commission vacated the violation and emphasized that there had to be proof that the hazard in question directly affected employees of the cited employer.
 
 
 20
 Similarly, in Martin Iron Works, Inc., CCH Employment Safety & Health Guide (1973-74 vol.) P 18,164 (1974), a subcontractor created a hazard, but then left a jobsite for a period of time. Martin was issued a citation for its violation, but the citation was vacated since none of Martin's employees were directly exposed to the hazard. The fact that other employees were exposed to the hazard was disregarded. But see id. at 22,341 (Commissioner Cleary dissenting). And in Brennan v. Gilles & Cotting, Inc., supra, the Fourth Circuit, considering OSHRC determinations to be subject "to a narrow scope of review which requires the courts of appeals to defer to Commission decisions of policy questions within their relatively broad area of discretion," 504 F.2d at 1267, proceeded to uphold an OSHRC determination that general contractors were not concurrently or vicariously responsible as to a subcontractor's employees, and remanded for an express determination by the commission whether access to the zone of danger alone by the employer's employees is enough or whether proof of actual presence is required. Id. at 1263-66. The court indicated, however, that it would defer to the commission's "expertise and experience." Id. at 1264.[9]
 
 
 21
 Concededly, the OSHRC decision below finds some support in the language of the "general duty" clause of the Act, note 8 supra, that an employer's duty runs to "his employees" (emphasis supplied), rather than a broader duty to keep a work area safe for any employees having access to that area. In addition, the Act narrowly defines "employee" to mean "an employee of an employer who is employed in a business of his employer which affects commerce." 29 U.S.C. § 652(6).
 
 
 22
 But to draw from this a general rule that standards under the Act can be violated only when a cited employer's own employees are shown to be directly exposed to a violation of a standard seems to us to be wholly unwarranted. It also fails to give effect to the clause under which Dic-Underhill was cited, subparagraph (2) of § 654(a). That subparagraph requires employers to "comply with occupational safety and health standards promulgated under the Act." This specific duty to comply with the Secretary's standards is in no way limited to situations where a violation of a standard is linked to exposure of his employees to the hazard.[10] It is a duty over and above his general duty to his own employees under § 654(a)(1).[11] See Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988, 989 (1973). In a situation where, as here, an employer is in control of an area, and responsible for its maintenance, we hold that to prove a violation of OSHA the Secretary of Labor need only show that a hazard has been committed and that the area of the hazard was accessible to the employees of the cited employer or those of other employers engaged in a common undertaking.
 
 
 23
 The standards are intended to be the primary method of achieving the policies of the Act. See 116 Cong.Rec. 38371 (1970) (remarks of Congressman Steiger); Brennan v. OSHRC and Gerosa, Inc., 491 F.2d 1340, 1343 (2d Cir. 1974). We have previously pointedly noted reference to the Act as "revolutionary" and have said that it was "an important piece of remedial legislation." Id. We have taken the view, in contradistinction to that of the Fourth Circuit, that our role
 
 
 24
 is to decide whether the Commission's interpretation of the Regulation is unreasonable and inconsistent with its purpose, the normal standard for review of the interpretation of a regulation by the agency charged with its administration.[12]
 
 
 25
 We believe the Commission's narrow interpretation of the construction regulations unreasonable. We have in mind the broad purpose of the Act "so far as possible" to assure "every working man and woman in the Nation safe and healthful working conditions. . . . " 29 U.S.C. § 651(b). It was the intention of Congress to encourage reduction of safety hazards to employees "at their places of employment." 29 U.S.C. § 651(b)(1). Plainly, material overhanging a floor of a high-rise building project creates a hazard to employees on the job site who work or may work below the material. There were 437 Dic-Underhill employees on the site as well as unidentified tradesmen and two groups of bricklayers observed passing or working below. We must presume that the Secretary had in mind not just the general statistics as to occupational hazards,[13] but also those specifically relating to the construction industry. A recent Labor Survey discloses that one out of every ten full-time workers in the 63 million workers covered by the Act were injured in 1973. Significantly, the construction industry had almost the highest rate of injury of any major category of employment, with approximately 19 out of every 100 employees suffering an occupational injury or illness during the period of the Survey. The Survey shows that the contract construction industry injury rates increased 4.2 per cent over the two year period 1972-73.[14]
 
 
 26
 It is hazards toward which the Act was directed. See, e. g., 29 U.S.C. §§ 657(f)(1), 662, 666(j). The legislative history is supportive of the proposition that actual observed danger is unnecessary. As the House Labor Committee stated:
 
 
 27
 Death and disability prevention is the primary intent of this bill. Although possible penalties for violations may be an important deterrent, they are only a partial solution. If we are to reduce disabilities and fatalities, it is essential that we guarantee adequate warning of possible hazards.
 
 
 28
 Leg. Hist. of the Occupational Safety & Health Act 1970 at 853 (emphasis added).
 
 
 29
 (B)y not attaching a penalty to (nonwillful) violations the Committee is reaffirming its belief that if employers are warned of potential danger, they will remedy a deterioration in working conditions.
 
 
 30
 Id. at 856 (emphasis added).[15] This is the view repeatedly taken by the courts. Brennan v. Gerosa, Inc., supra, 491 F.2d at 1344; Brennan v. Southern Contractors Service, 492 F.2d 498, 501 (5th Cir. 1974); Brennan v. OSHRC and Vy Lactos Laboratories, Inc., 494 F.2d 460, 463 (8th Cir. 1974). The keystone of the Act in short is preventability. National Realty and Construction Corp. v. OSHRC, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1266-67 (1973).
 
 
 31
 In this regard it is not insignificant that it was Dic-Underhill that created the hazards and maintained the area in which they were located. It was an employer on a construction site, where there are generally a number of employers and employees.[16] It had control over the areas in which the hazards were located and the duty to maintain those areas. Necessarily it must be responsible for creation of a hazard.
 
 
 32
 What we have said carries with it the arguments of Dic-Underhill that its employees were not exposed to the dangers of the stored shoring and steel bracing material. But it also meets its additional arguments, made in respect to the three perimeter guardrail violations of 29 C.F.R. § 1926.500(d)(1), that as to the first only the field engineers who were "checking targets" (and had to lean out over the edge of the building to do so) and no other employees were seen; that as to the second only one man (though a Dic-Underhill employee) 15 feet away from the edge and not in danger of falling was observed; and as to the third, the two men using the ceiling sanding machine were 10 feet from the edge and hence not exposed. One takes it that Dic-Underhill would have us hold that for a citation properly to issue, an employee of the particular employer creating the perimeter hazard must be seen by an inspector teetering on the edge of the floor 150 feet or so up from the ground. No such interpretation of the standards would be reasonable. No such interpretation is consistent with, let alone called for by, the Act.
 
 
 33
 Accordingly, with respect to the violation of 29 C.F.R. § 1926.250(b)(1) for the reasons stated we set aside the order of the Commission and reinstate the citation and penalty imposed by the Secretary of Labor.
 
 
 34
 With respect to the violations of 29 C.F.R. § 1926.500(d)(1) we deny the petition to review the order of the Commission.
 
 
 
 [1]
 The joint venture employed some 437 employees on the workside in question, and even as subcontractor it had considerable control over and responsibility for the work areas on the building site
 
 
 [2]
 29 U.S.C. § 651 et seq. This court considered the Act in Brennan v. OSHRC and John J. Gordon Co., 492 F.2d 1027 (2d Cir. 1974), interpreting the Act to make "maximum use of the commerce power . . . ." Id. at 1030. To avoid the confusion of citing to a number of cases all of which are entitled Brennan v. Occupational Safety & Health Commission, the name of the employer has been added to several case names in this opinion and the Occupational Safety & Health Review Commission has been abbreviated to OSHRC
 
 
 [3]
 Under the Act, a serious violation
 shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 29 U.S.C. § 666(j). Under § 666(c) a "nonserious" citation involves a determination that the violation in question was "specifically determined not to be of a serious nature."
 
 
 [4]
 29 C.F.R. § 1926.500(f)(1) provides specifications for the "standard railing" as follows:
 A standard railing shall consist of top rail, intermediate rail, toeboard, and posts, and shall have a vertical height of approximately 42 inches from upper surface of top rail to floor, platform, runway, or ramp level. The top rail shall be smooth-surfaced throughout the length of the railing. The intermediate rail shall be halfway between the top rail and the floor, platform, runway, or ramp. The ends of the rails shall not overhang the terminal posts except where such overhang does not constitute a projection hazard . . . .
 
 
 [5]
 Target checking involves attaching an object or making a mark which can be sighted with surveyor's instruments located elsewhere. At the hearing before the administrative law judge, Mr. Grudzwick conceded that he was unsure about what the term "checking targets" meant; however, he was sure that the men had to lean over the edge of the building to do whatever they were doing
 
 
 [6]
 Mr. Grudzwick, the only witness at the hearing, offered conflicting testimony as to whether the job could be done with perimeter protection in place, but since he conceded that he wasn't even sure about what the workers were doing at the time he observed them, his opinions in this matter have little probative value
 
 
 [7]
 Chairman Moran dissented arguing that there was insufficient proof of direct employee exposure to the violations charged in the two November 27 incidents. Further, he argued that with respect to the "target checking" incident, there was proof that noncompliance with the requirements of the standard was justified because it was necessary to permit the accomplishment of required work
 
 
 [8]
 § 654. Duties of employers and employees
 (a) Each employer
 (1) Shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees . . . .
 
 
 [9]
 The court did so despite its cogent observations, 504 F.2d at 1263-64, that
 If access alone is sufficient to show a violation, the Secretary will often be able to make out a case solely on the basis of the testimony of the compliance officer. If, however, proof of employee presence in the zones of danger is required, then unless the compliance officer chances to see employees in a danger zone at the time of his inspection, the Secretary will have to depend on workers' willingness to testify against their employers under the antiretribution umbrella of § 11(c)(1) of the Act. Recalcitrant employers may be able to impede enforcement of the Act by refusing to correct safety violations disclosed by an inspection unless for each and every violation the Secretary is able to marshal employee testimony that, e. g., dangerous equipment available for use was actually used or that hazardous areas accessible to workers were at one time passed through or occupied.
 
 
 [10]
 Dic-Underhill argues that one of the Secretary's own regulations supports the Commission's point of view. That regulation, however, states only that:
 In the event a standard protects on its face a class of persons larger than employees, the standard shall be applicable under this part only to employees and their employment and place of employment.
 We take this as relating to protection of employees as a class as opposed to, say, passersby or unrelated third persons. We note that the Fourth Circuit gave this regulation broader reading in Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255, 1260 (4th Cir. 1974), by holding that it did not "require employers in multiple-employer industries to obey safety regulations for the protection of other employers' workmen . . . ." We respectfully disagree with this interpretation.
 
 
 [11]
 The "general duty" clause was construed by this court in REA Express, Inc. v. Brennan, 495 F.2d 822 (2d Cir. 1974)
 
 
 [12]
 So holding, we said that this may indeed be unduly deferential to the Commission, although we also noted, 491 F.2d at 1344, n. 12, that this by no means meant that we would look solely to the Secretary for interpretation of the standards he promulgates
 
 
 [13]
 E. g., for the years 1966-70, 14,500 workers died annually in industrial accidents; 2.2 million persons were disabled each year; 250 million workdays were lost each year with $1.5 billion wasted in lost wages. The impact on the Gross National Product was estimated at $8 billion. From 1958 to 1970 the number of disabling injuries per million man hours worked had increased by 20 per cent. 3 U.S.Code Cong. & Admin.News, 91st Cong., 2d Sess. 1970 at pp. 5177-79
 
 
 [14]
 Survey of the Bureau of Labor Statistics of the Dep't of Labor 1972-73, USDL-74-687, 1, Table 4 (Dec. 20, 1974). It should be noted that with regard to the statistics on the "contract construction industry," the Labor Survey includes in that single category highway and street construction as well as the construction of buildings
 
 
 [15]
 The House subsequently rejected the Committee's theory that penalties were not needed to ensure employer abatement of potential hazards. The version adopted required penalties for all serious violations and permitted penalties of up to $1,000 for nonserious ones. 29 U.S.C. § 666(b) and (c)
 
 
 [16]
 See generally Note, OSHA: Developing Outlines of Liability in Multi Employer Situations, 62 Geo.L.J. 1483 (1974)