**Richard GODWIN, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMIS- SION, Respondent.**

No. 75–2196.

United States Court of Appeals, Ninth Circuit.

Aug. 16, 1976.

David A. Rosenfeld of Van Bourg, Allen, Weinberg, Williams & Roger, San Francisco, Cal., for petitioner.

Robert K. Salyers, Jr., Atty. of U. S. Dept. of Labor, Washington, D. C., for respondent.

OPINION

Before CARTER and ELY, Circuit Judges, and BURNS,* District Judge.

JAMES M. CARTER, Circuit Judge:

The issue in this appeal is whether Les Mares Enterprises, Inc. (hereafter "Les Mares") was an "employer engaged in a business affecting commerce" and therefore subject to the jurisdiction of the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651, *et seq.*) (hereafter the "Act"). We hold that Les Mares was such an employer and we reverse the decision of the Occupational Safety and Health Review Commission (hereafter the "Commission").

In late 1972, Les Mares owned several hundred acres of Napa Valley land, and it had employees engaged in clearing the land. As part of the clearing operation it was using a guillotine-like wood-chopping machine. The machine caused repeated employee complaints and accidents, including one incident in which a worker, petitioner Richard Godwin, lost three fingers from his right hand.

Pursuant to a routine inspection conducted by an authorized representative of the Secretary of Labor, Les Mares was cited on March 5, 1973, for a violation of 29 U.S.C. § 654(a)(1), for failing to furnish its employees "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." Les Mares was served with a proposed penalty of $600 for this violation, and ordered to abate the condition within one day. Les Mares timely contested the citation and proposed penalty, pursuant to 29 U.S.C. § 659(c), and a hearing was conducted before one of the Commission's administrative law judges.

This judge found that there was an effect on interstate commerce and that the Commission therefore had jurisdiction. The judge held that the charged violation was valid. On review of this decision sought by Les Mares, the Commission reversed the administrative law judge. The Commission held that Les Mares was not engaging in a business affecting commerce because at the time of the citation and hearing Les Mares had not completed its plans to plant a vineyard and hence had not engaged in a business affecting commerce.

Les Mares admitted that its purpose in clearing the land was to plant a vineyard, and to sell grapes to wineries or produce wine itself. At the time of the hearing the activities had progressed beyond clearing. The land was being "ripped", a cultivation process that normally immediately precedes the planting of grapes. However, no vineyards had been planted and Les Mares had not yet determined whether it would do the growing and winemaking itself or lease the land to others for that purpose.

Uncontradicted testimony at the hearing showed that 65–70% of the wine produced in California is shipped out of state, and that at least 25–30%, and possibly up to 50%, of the wine produced in the Napa Valley location of Les Mares' land is shipped out of state. Testimony also showed that a significant amount of Napa Valley grapes is sold to wineries outside the valley, whose products move in interstate commerce. Also, tourists from out of state frequent Napa Valley wine-tasting rooms, where wine is made available for sale.

## I. *Scope of the Occupational Safety and Health Act.*

29 U.S.C. § 651 sets forth the Congressional statement of findings and declaration of purpose and policy. This section reads, in part:

"The Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses and disability compensation payments.

---

* Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

"The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure *so far as possible* every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ." (emphasis supplied)

The background of the Act was described in *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 1259 (4 Cir. 1974), as follows:

"Confronting a legislative record which showed that each year 14,500 workers died and two million were disabled because of their jobs, resulting in $1.5 billion in lost wages and an $8 billion loss to the GNP [citation], Congress passed a wide-ranging bill, characterized by one commentator as 'the most revolutionary piece of "labor" legislation since the National Labor Relations Act.'" (citation)

The Act imposes duties under § 654 on "employers". 29 U.S.C. § 652(5) provides, in part: "The term 'employer' means a person engaged in a business affecting commerce who has employees . . . ."

■ The phrase "affecting commerce" in this Act has been interpreted by two other circuit courts as an indication that Congress exercised its full powers under the Commerce Clause. *United States v. Dye Construction Co.,* 510 F.2d 78 (10 Cir. 1975), and *Brennan v. Occupational Safety & Health Review Com'n,* 492 F.2d 1027 (2 Cir. 1974). *Dye,* at 83, stated that, "The use of the words 'affecting commerce' tells us that it was the intent of Congress to exercise fully its constitutional authority under the commerce clause." (citations) *Brennan,* at 1030, held similarly and stated:

"Throughout the legislative history of the Act, the objective was repeatedly stated to be to make maximum use of the commerce power . . . ."

We hold also that Congress intended the coverage of the Act to be as broad as the scope of the commerce clause.[1]

## II. *The "Affecting Commerce" Constitutional Limitation.*

The power of the Congress, acting pursuant to the Commerce Clause, to regulate intrastate activities which substantially affect interstate commerce, was perhaps best enunciated by the Supreme Court in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). At issue in *Wickard* was the Agricultural Adjustment Act of 1938, which attempted to control the volume of wheat moving in interstate commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat price. The Supreme Court held that:

"[t]he effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial. [citation]

". . . It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. . . . This record leaves us in no doubt that Congress may properly have considered that wheat consumed

1. For two examples where Congress did not choose to exhaust its constitutional powers over commerce, *see 10 East 40th St. v. Callus,* 325 U.S. 578, 579, 65 S.Ct. 1227, 1228, 89 L.Ed. 1806 (1945) ["In enacting this statute Congress did not see fit, as it did in other regulatory measures, *e. g.,* the Interstate Commerce Act and the National Labor Relations Act, to exhaust its constitutional power over commerce"] and *Mitchell v. H. B. Zachry Co.,* 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960), both cases dealing with the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.;* and *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), dealing with the Clayton and Robinson-Patman Acts, 15 U.S.C. § 14 and § 13(a), respectively.

on the farm where grown, if wholly outside the scheme of regulation, would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices." *Id.* at 127–29, 63 S.Ct. at 90.

In the case at bar the activity of clearing land for the purpose of growing grapes is an activity which, if performed under unsafe conditions, will adversely affect commerce. Clearing land is an integral part of the manufacturing of wine, and therefore commerce is affected by the activity. *Hodgson v. Ewing*, 451 F.2d 526, 528 (5 Cir. 1971). *Hodgson* held that an employer in the business of clearing brush for the improvement of agricultural land could be regulated by Congress. We note that under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, involved in *Hodgson*, Congress used the phrase "closely related and directly essential" to commerce, a phrase indicating that the Act does not extend to the maximum authority given the Congress under the Commerce Clause.[2] A fortiori the similar activity can be covered by an Act utilizing the broader test, "affecting commerce." *See generally, Mandeville Farms v. Sugar Co.*, 334 U.S. 219, 229, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

We do not think it significant that, at the time of the hearing, grapevines had not yet been planted and grapes had not been harvested and turned into wine. The effect on interstate commerce nevertheless exists. The activity undertaken is a necessary part of the growing process of grapes, which activity must be undertaken by all growers. Les Mares' activity, taken together with land clearing by others, would surely affect commerce if unsafe working conditions were utilized and accidents resulted at all

locations. "Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975).

█ Congress recognized that unsafe working conditions existing in one business affected all other businesses similarly situated. Congressman Sikes, a sponsor of the bill, stated:

". . . Many employers, particularly smaller ones, simply cannot make the necessary investment in health and safety and survive competitively unless all are required to do so. Thus, competitively, the conscientious employer is at a disadvantage." 116 Cong.Rec. 38704 (1970).

The effect of permitting one business to use cheaper—but more dangerous—work methods will tend to force competitors to cut their land clearing costs similarly.[3]

█ Also, as a practical matter, to hold that this business did not affect commerce because the business activity had not progressed beyond preparing the land would unduly delay and hinder enforcement of the Act, because the Secretary of Labor would have to wait until grapes had been planted or harvested before citing Les Mares for serious violations of the Act. The land here involved was cleared with the purpose of growing grapes. To wait until planting or harvesting would be a meaningless gesture.

We hold that the clearing of land for the purpose of growing grapes is a business which affects interstate commerce.

REVERSED.

---

2. *See* footnote 1, *supra.*

3. *Brennan v. Occupational Safety & Health Review Com'n, supra*, 492 F.2d at 1030 recognized that, ". . . States and employers insisting on a high degree of safety should not be disadvantaged by the failure of others to do so." (citations)

   *See also, e. g., United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 121, 62 S.Ct. 523, 527, 86 L.Ed. 726 (1942):

"Such a handler [an intrastate handler of milk] would have an advantage over others in the sale of the class of milk in which he principally deals, and could force his competitors dealing in interstate milk to surrender the market or seek to reduce prices to producers in order to retain it."

ELY, Circuit Judge (concurring):

I reluctantly concur. The event in question occurred during the cutting of timber, the plan of the land owner being that after the land was cleared, grapevines would be planted, grapes would be grown, wine would be produced therefrom and, eventually, a portion of the wine would be sold in interstate commerce. It requires no great imagination to envision any number of circumstances that could have prevented the fulfillment of the eventual objective. For that reason, it is almost inconceivable to me that an accident at such an early stage could be held to have an interstate nexus, a nexus based on nothing more than the avowed intention of one man to do something sometime in the future that would involve interstate commerce. To me, it is virtually unthinkable that the Founding Fathers could have foreseen the extent to which an increasingly expansive interpretation of the Commerce Clause could so infringe local authority.

Notwithstanding all of the foregoing, in light of *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), *Farmers' Irrigation Co. v. McComb*, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949), and *Hodgson v. Ewing*, 451 F.2d 526 (5th Cir. 1971), I do not feel that I can conscientiously dissent.