Ray **MARSHALL**, Secretary of Labor, Petitioner,

v.

**WESTERN ELECTRIC, INC.,** and Occupational Safety and Health Review Commission, Respondents.

No. 96, Docket 77–4076.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1977.

Decided Nov. 4, 1977.

Dennis K. Kade, U.S. Dept. of Labor, Washington, D.C. (Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, and Michael H. Levin, counsel for App. Litigation, U.S. Dept. of Labor, Washington, D.C., on the brief), for petitioner.

Laurel J. McKee, New York City (Robert A. Levitt, and Lawrence M. Joseph, New York City, on the brief), for respondent Western Electric Co., Inc.

Before WATERMAN, ANDERSON and MANSFIELD, Circuit Judges.

ANDERSON, Circuit Judge:

The Secretary of Labor petitions for review of an order of the Occupational Safety and Health Review Commission, which held that respondent, Western Electric, Inc., did

not violate the Emergency Temporary Vinyl Chloride Standard issued by the Secretary under the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. §§ 651, et seq. The Secretary complains that Western Electric violated 29 C.F.R. § 1910.93q(c)(1) by failing to monitor the air in every work area in which vinyl chloride gas was released to determine whether the air contained vinyl chloride in concentrations exceeding 50 ppm (parts per million).[1]

Western Electric operates a plant in Lee's Summit, Missouri, which produces electrical components. As a part of the process for insulating these components, heated metal rings are dipped into a compound known as "Hysol," a plastisol containing polyvinyl chloride suspended in a liquid plasticizer. When Hysol is heated to a temperature of 360° F. by the metal rings, the polyvinyl chloride fuses with the plasticizer and coats the rings. At the same time, the polyvinyl chloride releases vinyl chloride into the air in the form of gas.

In early 1974, the Occupational Safety and Health Administration (OSHA) determined that vinyl chloride was a carcinogenic agent which, if breathed in sufficient quantities, could cause cancer of the liver. Based on this information, the Secretary issued an emergency temporary standard to regulate the presence of vinyl chloride in working areas. 29 U.S.C. § 655(c).[2] These regulations, published in the Federal Register on April 5, 1974, stated, in part, that "[a]s soon as possible but not later than April 22, 1974, every employer of an employee working in an area of operation in which vinyl chloride is manufactured, reacted, handled, processed, released, repacked or stored shall begin monitoring the ambient air of the area to determine whether it contains vinyl chloride in concentrations in excess of 50 ppm." The only operations exempt from this monitoring requirement were those involving the handling, storage, or other use of polyvinyl chloride in the form of fabricated products. 29 C.F.R. § 1910.93q(a)(2).[3]

Western Electric did not begin testing for the presence of vinyl chloride in the air at its Lee's Summit plant until May, 1974. Mr. Alan Widner, an industrial hygienist for Western Electric, decided that because the plant used neither vinyl chloride nor polyvinyl chloride resin as a raw material, its operations were not subject to the monitoring requirements of the emergency standard. Because of his concern for the safety of the workers in the plant, however, he monitored the operation which he concluded

---

1. The emergency standard was promulgated on April 5, 1974, and was codified at 29 C.F.R. § 1910.93q. 39 F.R. 12343 (April 5, 1974). It was superseded on January 1, 1975, by a permanent standard, now codified at 29 C.F.R. § 1910.1017. 39 F.R. 35890 (October 4, 1974). The monitoring provision of the emergency standard provides as follows:

"1910.93q(c) *Monitoring*—(1) *Initial monitoring.* As soon as possible but not later than April 22, 1974, every employer of an employee working in an area or operation in which vinyl chloride is manufactured, reacted, handled, processed, released, repacked, or stored shall begin monitoring the ambient air of the area to determine whether it contains vinyl chloride in concentrations in excess of 50 ppm.
(2) *Frequency.* Monitoring of a sufficient number of employees so that a representative sample of exposures to vinyl chloride may be determined shall be accomplished not less frequently than weekly until all results for three consecutive weeks are at or below 50 ppm. Thereafter, monitoring shall be conducted not less frequently than monthly so

long as the concentrations of vinyl chloride do not exceed 50 ppm. If a monitoring sample reveals vinyl chloride in concentrations in excess of 50 ppm, weekly monitoring shall be resumed until all results for three consecutive weeks are at or below 50 ppm."

2. 29 U.S.C. § 655(c)(1) states that:

"The Secretary shall provide, without regard to the requirements of chapter 5 of Title 5, for an emergency temporary standard to take immediate effect upon publication in the Federal Register if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger.

3. 29 C.F.R. § 1910.93q(a)(2) states that:

"This section does not apply to the handling, storage, or other use of vinyl chloride polymers and copolymers in the form of fabricated products."

would release the most vinyl chloride, *i. e.* the welding of polyvinyl chloride sheets. After determining that the ambient air in the area of this operation contained vinyl chloride in concentrations well within the range acceptable to the Secretary, Mr. Widner assumed that workers in other areas of the plant would be safe from vinyl chloride exposure and, therefore, did not monitor any other plant operations.

■ On May 31, 1974, the Lee's Summit plant was inspected by an OSHA representative, Mr. Albert Stewart, who learned that the air in the area of the Hysol-dipping operation had not been monitored for the presence of vinyl chloride. He took three samples of the air in the tank, one of which revealed vinyl chloride in the air at a concentration of 1.7 ppm. As a result of this inspection, the Secretary issued Western Electric a citation and notice of proposed penalty for failing to monitor the air surrounding the tank containing Hysol to determine whether it contained excessive amounts of vinyl chloride. Although Western Electric admitted that it had failed to monitor the area, the company denied that it had violated § 1910.93q(c)(1) of the emergency standard. Western Electric argued that the regulations were inapplicable to the operation because Hysol was a fabricated product and that, in any event, no vinyl chloride was "released" within the meaning of the standard because the concentration of vinyl chloride in the air did not exceed 5 ppm.[4]

A hearing was held before an administrative law judge on January 8, 1975, at which Mr. Stewart, an OSHA chemist, Mr. Widner, and a chemical analyst for Western Electric testified. After reviewing the testimony, the administrative law judge affirmed the Secretary's citation; but, in light of Western Electric's record of concern for the safety of its employees and eagerness fully to comply with the Act, he vacated the proposed monetary penalty. He rejected Western Electric's argument that Hysol was a fabricated product and, therefore, exempt from the emergency temporary vinyl chloride standard because the process of coating heated metal rings with Hysol involved a reaction between polyvinyl chloride and the liquid plasticizer at which time vinyl chloride was released. He concluded that this operation was a form of fabrication to which the standard was applicable. See *Society of Plastics Industry, Inc. v. OSHA*, 509 F.2d 1301 (2d Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). He also rejected Western Electric's claim that in order to constitute "release of vinyl chloride," readings taken of the ambient air must exceed 5 ppm. He held that the 5 ppm level was selected by the Secretary, for purposes of the standard, as the concentration of vinyl chloride gas which monitoring devices must be capable of detecting and not as a benchmark by which to decide whether or not vinyl chloride was being released. Relying on the plain language of the standard, which requires physical monitoring of any operation releasing vinyl chloride gas, he

**4.** Western Electric relied on the provision of the emergency standard which required that the analytical procedure for monitoring work areas must be sensitive to 5 ppm of vinyl chloride in the air. 29 C.F.R. § 1910.93q(c)(3). It reasoned that because the amounts of vinyl chloride gas released in the ring coating process would go undetected by a monitoring device sensitive to 5 ppm, no gas could be said to have been "released." This argument overlooks the fact that even to determine that *no* vinyl chloride was released by the Hysol operation, some initial monitoring would have had to have been conducted. Mr. Widner was an expert industrial hygienist. He had knowledge that heating would accelerate the rate at which vinyl chloride was released from polyvinyl

chloride. This should have led him to conclude that *some* vinyl chloride was released in the Hysol-dipping process. Under the emergency standard, it became his duty to verify the *amount* of vinyl chloride released into the air by objective physical monitoring.

Moreover, unlike the permanent standard which establishes an "action level" of 0.5 ppm for the purpose of requiring continuous monitoring, see 29 C.F.R. § 1910.1017(d)(1), the emergency standard required continuous monitoring over a six-month period without regard to any action level. Western Electric's contention that 50 ppm was the "action level" for the purposes of the emergency standard is plainly at odds with the requirements of § 1910.-93q(c)(2). See note 1, *supra*.

held that Western Electric had violated the standard by failing to monitor the ring-coating process.

Western Electric obtained discretionary review, under 29 U.S.C. § 661(i), by the Commission, which set aside the administrative law judge's decision and vacated the citation. The Commission held that Western Electric could reliably predict from the physical circumstances that the concentration of vinyl chloride in the air resulting from the coating operation would be well below the danger level set by the Secretary; and, therefore, formal physical monitoring was not required. It reasoned that the standard was designed to protect employees from the grave danger of exposure to vinyl chloride concentrations in excess of 50 ppm and that it would, therefore, be unreasonable to interpret the standard to require the useless act of monitoring in situations in which there was no realistic possibility that the 50 ppm limit would be approached. Because of this ruling that monitoring was unnecessary, the Commission did not reach the question of whether Hysol was, in itself, a fabricated product exempt from the standard, as distinct from its use in coating, and thereby fabricating, the rings. Following the Commission's decision, the Secretary brought this petition for review, under 29 U.S.C. § 660(b).

The Secretary claims that the Commission's interpretation of the monitoring requirement of the emergency standard is unreasonable. He argues that the standard expressly requires physical monitoring of every operation in which any vinyl chloride is released, regardless of the ability reliably to predict the concentration of this gas in the air, and that, on this construction of the standard, it is clear that Western Electric failed to live up to its requirements.

■ Although the courts have differed in deciding what deference to give the Commission's interpretations of health and safety regulations, especially when such interpretations conflict with those of the Secretary; compare *Brennan v. OSHRC and Roy M. Fiegen, Inc.*, 513 F.2d 713, 715–16 (8th Cir. 1975), and *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255 (4th Cir. 1974), with *Clarkson Constr. Co. v. OSHRC*, 531 F.2d 451 (10th Cir. 1976), and *Brennan v. Southern Contractors Service and OSHRC*, 492 F.2d 498 (5th Cir. 1974); this court has consistently held that its role "is to decide whether the Commission's interpretation of the Regulation is unreasonable and inconsistent with its purpose, the normal standard for review of the interpretation of a regulation by the agency charged with its administration." *Brennan v. OSHRC and Gerosa, Inc.*, 491 F.2d 1340, 1344 (2d Cir. 1974); accord, *Brennan v. OSHRC and Underhill Construction Corp.*, 513 F.2d 1032 (2d Cir. 1975).

■ In this case, the Commission's interpretation of the emergency standard, which created a "reliable prediction" exception to the monitoring requirement, was unreasonable. The standard, which was effective for six months,[5] was designed to protect workers from the grave danger of vinyl chloride exposure. The scope of the standard was comprehensive, *i. e.* it applied to any area or operation in which vinyl chloride was released, with the sole exception of the storage, handling or other use of polyvinyl chloride fabricated products. The standard required initial monitoring of all such areas and subsequent monitoring on a monthly or weekly basis depending on whether or not vinyl chloride concentrations exceeded 50 ppm. The monitoring requirements were the device which triggered into operation a compliance program for protecting workers against over-exposure to vinyl chloride and which checked the effectiveness of the program. 39 Fed.Reg. 12343 (April 5, 1974). The mandatory language of the standard was clear and there was no indication in the Secretary's introductory comments that any covered employers would be exempt from the duty of monitoring for vinyl chloride gas.

---

5. 29 U.S.C. § 655(c)(3) provides that upon promulgation of an emergency standard, the Secretary shall commence rulemaking proceedings and shall issue a permanent standard no later than six months after publication of the emergency standard.

■ The reasonableness of any construction of the emergency temporary vinyl chloride standard must be considered in the light of the broad, remedial purpose of the Act which is "so far as possible" to assure "every working man and woman in the Nation safe and healthful working conditions . . . ." 29 U.S.C. § 651(b), cited in *Brennan v. OSHRC and Underhill Construction Corp., supra*, at 1038. The Secretary's interpretation of the standard offered the assurance that workers in areas in which vinyl chloride was released would be aware of the need for protective measures. Such assurance was particularly important during the period in which the emergency standard was in effect because the exact dimensions of the vinyl chloride danger were unclear.[6] If the Commission's position were accepted, workers would be forced to rely on an employer's predictions for their safety, rather than on an actual measurement of the danger.

The Secretary's interpretation of the standard, therefore, was better calculated than the Commission's to achieve the congressional goal of accident prevention and protection against potential danger. See *Usery v. Marquette Cement Manufacturing Co. and OSHRC*, 568 F.2d 902 (2d Cir. 1977). Although Western Electric's efforts to predict the amount of vinyl chloride in the air breathed by its workers were sound and sensible, it should not be permitted to substitute its monitoring method for that prescribed by the Secretary. The Commission's characterization of monitoring as a "useless act," in situations in which it could be reliably predicted from the phys-

ical circumstances that vinyl chloride concentrations would be below the permissible maximum, is unfortunate. If, in some circumstances, formal physical monitoring simply confirms the predicted safety of the working environment, it is a very useful act from the point of view of the employee whom the standard is designed to protect. The unequivocal language of the standard does not support a "reliable prediction" limitation on the duty to monitor; and accordingly, the Secretary's interpretation, that initial monitoring was required in any work environment where vinyl chloride was released, is the only reasonable interpretation of the standard.

■ There is no dispute in this case that some quantity of vinyl chloride was released during Western Electric's Hysol-dipping operation. Although the Commission declined to reach the question of whether Hysol is a "fabricated product" for the purposes of the emergency standard,[7] it is not necessary to remand the case to the Commission for a finding on this issue. Cf. *Brennan v. OSHRC and Hanovia Lamp Division*, 502 F.2d 946 (3rd Cir. 1974). In this case, the administrative law judge concluded that Hysol was not a fabricated product because it was significantly altered in the process of coating metal rings with polyvinyl chloride. A review of the record considered as a whole shows that there was substantial evidence to support a finding that Western Electric's operation of coating the heated metal rings was a form of fabrication. 29 U.S.C. § 660(a); cf. *General*

---

**6.** In this regard, it is instructive to note that while the permissible concentration of vinyl chloride gas was 50 ppm under the emergency standard, it was reduced to 1 ppm in the permanent standard after further examination in rulemaking proceedings of the danger of vinyl chloride exposure.

**7.** The emergency standard did not define the term "fabricated product." It has been defined in the permanent standard as "a product made wholly or partly from polyvinyl chloride and which does not require further processing at temperatures, and for times, sufficient to cause mass melting of the polyvinyl chloride resulting in the release of vinyl chloride." 29 C.F.R.

§ 1910.1017(b)(6). Western Electric contends that this definition should be applied to determine whether or not Hysol is a fabricated product. While such an application would be appropriate in determining whether Hysol is a fabricated product within the meaning of the permanent standard, it would be anomalous to apply to the emergency standard a definition which was not operative until the standard was superseded. It is within the adjudicatory power of the Commission to decide what products were "fabricated" for the purposes of the emergency standard. See *Brennan v. Gilles & Cotting, Inc., supra; Brennan v. OSHRC and Roy M. Fiegen, Inc., supra*.

*Electric Co. v. OSHRC*, 540 F.2d 67 (2d Cir. 1976). Metal rings heated to 360° F. are dipped into Hysol compound. This application of heat, sufficient to melt polyvinyl chloride, allows suspended polyvinyl chloride to enter into solution with the liquid plasticizer. This solution bonds to the metal rings and solidifies to form an insulating material. The change in the properties of Hysol, when it is subjected to a heat of 360° F., causes it to release greater amounts of vinyl chloride gas.

Whatever the treatment of Western Electric's Hysol-coating operation under the permanent standard, see note 7, *supra*, this process is undoubtedly a form of fabrication for the purposes of the emergency standard, which applied to the processing of polyvinyl chloride products which contain absorbed vinyl chloride. 39 Fed.Reg. 12343 (April 5, 1974). Because the administrative record permits only one conclusion on the nature of the coating operation, it is appropriate for this court to review and accept the decision of the administrative law judge. See *Brennan v. OSHRC and John J. Gordon Co.*, 492 F.2d 1027 (2d Cir. 1974); cf. *Usery v. Marquette Cement Manufacturing Co. and OSHRC, supra,* 568 F.2d 902, 910–911.

Accordingly, the petition for review is granted. The order of the Commission is reversed and the case is remanded to the Commission for the sole purpose of entering a final order enforcing the decision of the administrative law judge.

Reversed and remanded.