573 F.2d 157
 6 O.S.H. Cas.(BNA) 1440, 1978 O.S.H.D. (CCH) P 22,628
BETHLEHEM STEEL CORPORATION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray
Marshall, Secretary of Labor, Respondents.
 Nos. 77-1425 and 77-1438.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 10, 1978.
Decided March 6, 1978.
 
 Denis V. Brenan, Philadelphia, Pa., for petitioner; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.
 Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Asst. Counsel for App. Litigation, Linda S. Lewis, Atty., U. S. Dept. of Labor, Washington, D. C., for respondents.
 Before ADAMS, BIGGS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 An Occupational Safety and Health Act standard for the use of industrial overhead cranes includes the phrase "under normal operating conditions." The Secretary of Labor and the Occupational Safety and Health Review Commission do not agree on whether maintenance operations are covered by the standard. We conclude they are not. Accordingly, we grant a petition for review and set aside a Commission order assessing a penalty against a crane owner.
 
 
 2
 Petitioner Bethlehem Steel was cited by the Occupational Safety and Health Administration on August 19, 1974 for a nonserious violation of a standard promulgated by the Secretary of Labor. The citation charged that petitioner maintained an unsafe condition near the overhead cranes in the open-hearth plant in Johnstown, Pennsylvania specifically, that large electrical resistor banks were too close to the area where men worked and exposed them to the hazard of shock or burns. After a hearing, an administrative law judge (ALJ), affirmed the citation, and his action was sustained by an evenly divided Occupational Safety and Health Review Commission.
 
 
 3
 The dispute centers around two cranes which are part of Bethlehem's Johnstown plant. Crane No. 502 has a capacity of 35 tons and is located about 35 to 45 feet above the ground. It has two trolleys and runs on tracks and a runway. The cab in which the operator rides is below the rails. There are walkways alongside the crane with clearances varying in width from 26 to 43 inches, and at various points obstructions such as control cabinets and line shafts restrict movement. To enter the cab of Crane 502, the operator must use the walkway.
 
 
 4
 The other crane, No. 560, is larger and has a rating of 240 tons. It also uses rails, trolleys and a runway but the cab is some distance below the walkway and the operator enters from a separate platform.
 
 
 5
 The electrical systems for both cranes use banks of resistors which are activated when specific functions of the crane are desired. For example, one bank of resistors operates the hoist mechanism, another, the movement along the rails. The ALJ found that the resistors are in boxes approximately 18 inches long and 6 to 10 inches high, stacked in banks with 25 to 30 resistors set one on top of another, and that one of the banks was 8 or 9 feet high. The resistors are located at various points along the walkways, high above the floor of the plant. If used for a considerable time, the resistors become hot enough to burn the skin and, if energized, they are capable of giving off an electrical shock. There are no protective coverings over the top or front of the resistor banks, but they are guarded on the sides.
 
 
 6
 In addition to the usual work of lifting and moving heavy objects, the cranes are sometimes used for replacement of light bulbs near the roof of the plant. To carry out this work with Crane 502, an electrician stands on the roof of the cab to replace the bulb. While he is doing this, energy to the crane is cut off. In the course of light bulb replacement, the ALJ found, the electrician sometimes walks near the resistors.
 
 
 7
 While inspecting, troubleshooting, and repairing, maintenance men use the walkways, but when the cranes perform their usual work of lifting and moving heavy objects, Bethlehem forbids employees from being on the walkways. When normal operations are in progress, the operator remains inside the cab where he is not close enough to touch the resistors.
 
 
 8
 Generally, when repair work is being performed, the cranes are immobilized and the resistors are not energized. However, on some occasions, in order to detect the cause of a malfunction, it is necessary to operate the crane. This is done under the direction of the maintenance men.
 
 
 9
 The OSHA regulation which is claimed to have been violated is set forth at 29 C.F.R. § 1910.179(g)(2)(i) under the general heading of "Overhead and Gantry Cranes," and reads:
 
 
 10
 "(2) Equipment. (i) Electrical equipment shall be so located or enclosed that live parts will not be exposed to accidental contact under normal operating conditions."
 
 
 11
 Bethlehem resisted the citation, arguing that this section applied to the crane operator and his assistant, but not to maintenance personnel. In finding against Bethlehem, the ALJ held that the standard also applied to maintenance personnel and stated that a different interpretation would be contrary to the broad objectives of the Act.
 
 
 12
 The standard under discussion is derived from the safety code for overhead and gantry cranes prepared by the American National Standards Institute (ANSI) and was adopted by the Secretary of Labor pursuant to authorization contained in 29 U.S.C. § 655(a).[1]
 
 
 13
 No elaboration or explanation of the standard accompanied the original promulgation by ANSI, but in February, 1975, its committee on crane safety did issue an interpretation. The committee consisted of representatives of labor, management, OSHA, manufacturers, and the Armed Forces. The unanimous view was that the standard did not apply to maintenance personnel.[2]
 
 
 14
 The ALJ considered the committee report but did not accept it as controlling. We agree that for a number of reasons the report was not binding on OSHA, although the views of experts in the field who are members of the organization which prepared the standards are entitled to consideration. Moreover, despite differing interpretations by several ALJs and the Review Commission,[3] this standard has not been amended or clarified by the Secretary through the exercise of his rulemaking procedures. He does, however, contend that maintenance personnel are among those protected by the standard and presses that position in this appeal.
 
 
 15
 The courts have differed in determining the scope of review applicable to appeals from the Occupational Safety and Health Review Commission,[4] and we have said that the Secretary and the Commission should have relatively broad discretion in interpreting the Act and regulations. Budd Co. v. OSHRC, 513 F.2d 201, 205 (3d Cir. 1975). In Budd, the Commission and the Secretary agreed on the meaning of a challenged safety standard, and we upheld their interpretation. Here, however, we are confronted with different circumstances.
 
 
 16
 The case before us is one of at least three recent OSHA proceedings involving the application of § 1910.179(g)(2)(i) to resistor banks controlling overhead cranes in steel mills. See also Secretary v. United States Steel Corp., OSAHRC Docket No. 10825, 5 OSHC 1289 (April 25, 1977); and Secretary v. Wheeling-Pittsburgh Steel Corp., OSAHRC Docket Nos. 10611, 11327, 14366, 13320, 5 OSHC 1495 (May 12, 1977).[5] The Review Commission was unable to articulate a majority view in the present case because one of the three commissioners recused and the other two were not in accord. The same question was presented several months later in United States Steel, supra. Although all three commissioners were unable to agree upon the meaning of § 1910.179(g)(2)(i), the majority held "normal operating conditions" did not include maintenance work on the crane itself. This interpretation is contrary to that reached in the case sub judice, as well as that urged by the Secretary and is somewhat more narrow than the view of ANSI, the organization that developed the rule.
 
 
 17
 The standard was not one adopted by the Secretary after notice, hearing and evaluation of evidence but was conceived by a nongovernmental agency as a product of its own investigation and research. Consequently, the Secretary's views are not as persuasive as they would have been if based upon his department's own review of the problem and deliberate choice of a satisfactory solution. In considering the weight to be given an administrative ruling, the Supreme Court said, "(T)he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). See also Adamo Wrecking Co. v. United States, --- U.S. ----, ---- n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978); General Electric Co. v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).
 
 
 18
 Unlike Budd, we do not have an authoritative agency interpretation to assist us since the decisions of the Commission are themselves in conflict and inconsistent with the Secretary's position. We rely, therefore, on the plain wording of the standard and conclude it does exclude maintenance personnel.
 
 
 19
 The standard states that "live parts will not be exposed to accidental contact under normal operating conditions" and does not mention maintenance operations. When a repairman is undertaking maintenance operations, the crane is not being used for its intended purpose of lifting and moving heavy objects.[6] Maintenance procedures often involve disconnecting various safety features which are in effect during "normal" operation and in many instances protective devices themselves must be repaired or given periodic maintenance. It is clear to us that the phrase "normal operating conditions" does not cover maintenance work on the cranes themselves.
 
 
 20
 The utilization of the cranes for replacement of light bulbs is in a somewhat different category. In that situation, the cranes themselves were not being repaired but were being used for maintenance work on the building. This is not the normal operating activity of the cranes and is merely an alternative way of reaching the light fixtures which apparently are a considerable distance above the floor. Nor is this operation a frequent occurrence. One witness testified the last time he had used crane 502 for changing light bulbs was five years before the hearing. Another witness testified that no bulbs had been changed by that crane for more than a year. Moreover, special safety procedures have been devised for this activity, such as shutting off the power on the crane except when it is moving to a new location.[7] Thus, the risk of exposure to the resistors by an electrician performing that work is remote. The very existence of the special safeguards described at the hearing is inconsistent with "normal operating conditions."
 
 
 21
 We conclude the standard as drafted does not extend to maintenance work on the crane itself or to the changing of light bulbs described at the hearing. The Review Commission and the ALJ, therefore, were in error in finding a violation against petitioner.
 
 
 22
 The purpose of OSHA standards is to improve safety conditions in the working place, by telling employers just what they are required to do in order to prevent or minimize danger to employees. In an adjudicatory proceeding, the Commission should not strain the plain and natural meaning of words in a standard to alleviate an unlikely and uncontemplated hazard. The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and the obligation to amend. See Irvington Moore, Division of U.S. Natural Resources, Inc. v. OSHRC, 556 F.2d 431 (9th Cir. 1977). In Diamond Roofing Co. v. OSHRC, 528 F.2d 645, 650, the Court of Appeals for the Fifth Circuit said:
 
 
 23
 "To strain the plain and natural meaning of words for the purpose of alleviating a perceived safety hazard is to delay the day when the occupational safety and health regulations will be written in clear and concise language so that employers will be better able to understand and observe them."
 
 
 24
 We find that statement pertinent here.
 
 
 25
 Bethlehem also contends that the cranes having been constructed before 1971 were exempt from coverage by virtue of an intricate interpretation of 29 C.F.R. § 1910.179(b)(2) by the Occupational Safety and Health Review Commission in OSHRC v. United States Steel, OSAHRC Docket No. 10825, 5 OSHC 1289 (Apr. 25, 1977). Because of our conclusion on the scope of the phrase "normal operating procedure," we need not meet that issue. Similarly, we do not treat Bethlehem's constitutional challenges, nor its contention that OSHA unreasonably delayed the issuance of its citation.
 
 
 26
 Accordingly, the order of the Commission will be set aside.
 
 
 27
 ADAMS, Circuit Judge, dissenting.
 
 
 28
 In this case we are called upon to interpret a standard promulgated by the Secretary of Labor under the Occupational Safety and Health Act (OSHA) which prohibits exposure of live electrical connections on overhead cranes "to accidental contact under normal operating conditions." Despite determinations by the Secretary of Labor and the Occupational Safety and Health Review Commission (OSHRC) to the contrary, the majority concludes that the regulation at issue should not be construed to protect maintenance workers. From this conclusion, I respectfully dissent.
 
 A.
 
 29
 On August 19, 1974, the Secretary of Labor issued a citation against Bethlehem Steel Corporation alleging, inter alia, a violation of 29 C.F.R. § 1910.179(g) (2)(i).[1] According to the citation, the failure to cover 250-volt resistor banks located immediately adjacent to narrow walkways of two of Bethlehem's overhead cranes violated the regulation by exposing employees to danger of accidental contact with the resistor banks. On July 5, 1975, an Administrative Law Judge sustained the citations, and imposed a $55 fine.
 
 The Administrative Law Judge found:
 
 30
 There is evidence in the record which establishes that employees of the respondent are exposed to the hazard of accidental contact with the resistor banks while the cranes are performing their normal functions. Mr. Pillock testified that when he is "trouble shooting" he is on the bridge walkway while the crane is performing normally and during this time he is close to the resistor banks. Mr. Johnson, who is in the business of inspecting cranes, testified that cranes can perform as usual during maintenance inspections. When a new operator is being broken in, there are two operators in the cab and one of the operators could use the walkway to get in and out of the cab while the crane is operating and the resistor banks energized.[2]
 
 
 31
 Such exposure, he held, violated § 1910.179(g)(2)(i).[3]
 
 
 32
 By an equally divided vote, OSHRC affirmed the decision by the Administrative Law Judge.[4] Commissioner Cleary supported the reasoning in the Administrative Law Judge's opinion, while Commissioner Moran would have reversed on the ground that the regulation does not apply to maintenance employees. The present appeal followed.
 
 
 33
 After the decision by the Commission, but before oral argument in this Court, however, OSHRC had occasion to examine the applicability of (g)(2)(i) with a full complement of Commissioners. In Secretary v. United States Steel Corp.,[5] Commissioner Moran again adopted the stance that (g)(2)(i) does not protect maintenance workers. Commissioner Cleary and Chairman Barnako both rejected this position.
 
 
 34
 Chairman Barnako's lead opinion in United States Steel held that "Whenever the crane is used in its regular production activities . . . it is used in a normal operating condition."[6] Thus, maintenance workers who perform their tasks while the crane is utilized in production are protected by the standard. In addition, Chairman Barnako held that when workers use the cranes to change light bulbs, the cranes are in "normal operating condition."[7] The opinion of Commissioner Cleary went still further in extending the protection provided by this regulation. He would have held that "normal operating conditions" are those "which occur on a regular or recurring basis," including regular maintenance.[8]
 
 
 35
 In the Budd Company v. OSHRC,[9] the Court reviewed a determination by the OSHRC that employers are not required to bear the expense of safety shoes that are mandated by OSHA regulations. We affirmed the Commission's reading of the regulations, stating:
 
 
 36
 (T)he agency's interpretation of a regulation "is deemed of controlling weight as long as it is one of several reasonable interpretations . . . even though the chosen exegesis may not appear quite as reasonable as some other construction" Roy Bryant Cattle Co. v. United States, 463 F.2d 418, 420 (5th Cir. 1972).[10]
 
 
 37
 Two of the three OSHRC Commissioners have now adopted the position that maintenance workers may be covered by (g)(2)(i). A majority of OSHRC has thus rejected the interpretation which this panel adopts. Yet Budd should defer to OSHRC's determination, so long as it is a reasonable reading of the regulation at issue. Nonetheless, in affirming a proposition espoused by a minority of OSHRC, the majority of this panel fails to demonstrate that the alternative selected by the agency is an unreasonable one.[11]C.
 
 
 38
 The record in this proceeding contains testimony that maintenance and "trouble-shooting" on the cranes occurred on a regular basis. Indeed, one witness testified that he performed maintenance work on one of the unguarded cranes every day that the crane was in operation. Thus, it would not seem to stretch the limits of language to classify such maintenance work as part of the "normal" operation of the cranes. Chairman Barnako, however, adopted the position that "operation" of a crane includes only the performance of its regular production functions. Under this view, when a crane is taken out of production, it is no longer "in operation". Since such an interpretation is not unreasonable, it is entitled to deference. Here the Administrative Law Judge found that exposure to live electrical connections occurred during production both when there was "trouble-shooting" by maintenance employees, and when new drivers were being trained. Neither of these operations is, on its face, so unforeseeable as to fall outside of a reasonable definition of "normal operating procedures."
 
 
 39
 In contrast, the majority apparently holds that any time a maintenance person is present, the crane is no longer in "normal operation." But the language of the standard affords no basis for such a conclusion. Rather, the regulation at issue does not distinguish between maintenance and non-maintenance employees, and thus the type of employee subject to danger does not provide a reasonable criterion for determining the extent of the regulation's coverage. While maintenance procedures that involve "disconnecting various safety features which are in effect during 'normal' operation"[12] might reasonably be excluded from the regulation, the Administrative Law Judge found that:
 
 
 40
 Such is not the situation in the instant case. Except for work on the resistors, all of the necessary inspection and maintenance work would be performed with the resistor banks covered.[13]
 
 
 41
 The text included within the four corners of the regulation thus provides no warrant for excluding maintenance employees from its protection. Nor, in my opinion, do the policies of OSHA supply justification for such a reading. The thrust of OSHA was "to assure so far as possible every working man and woman in the nation safe and healthful working conditions."[14] In light of this Congressional purpose a reasonable interpretation of the regulation which safeguards a broader class of workers would seem preferable to a reading which leaves more workers exposed to hazard.[15]
 
 
 42
 It is true, as the majority notes, that the Secretary of Labor is empowered to amend the standard so as to comprehend maintenance employees explicitly. But it is equally true that the employers are free to petition the Secretary to exclude maintenance workers.[16] The significant question is who should bear the burden of ambiguity pending clarification. Before us is a record that discloses a danger that employees working 35 to 45 feet above the ground will be shocked by uncovered electrical connections. The evidence in the record does not demonstrate that covering such connections would constitute a major financial or practical burden for the employers. Under such conditions, it does not seem appropriate to reverse a reasonable administrative determination that would protect the employees.
 
 
 
 [1]
 In pertinent part, § 655(a) reads:
 ". . . the Secretary shall, as soon as practicable during the period beginning with the effective date of this chapter and ending two years after such date, by a rule promulgate as an occupational safety or health standard any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. . . ."
 The drafters of OSHA contemplated that ANSI standards would provide a vehicle for the Secretary's adoption of national consensus standards. See American Fed'n of Labor & C. I. O. v. Brennan, 530 F.2d 109, 111 n.2 (3d Cir. 1975).
 
 
 [2]
 The report said in part:
 "This section applies only to electrical equipment that might accidentally be contacted by the operator or assistant in the normal performance of the crane functions. This would prohibit open knife switches, open face-plate controllers, open terminals, etc., in the vicinity of the operator or his assistant during normal operations. Although not specifically stated in the above section, it is assumed that it will be possible to de-energize any exposed electrical equipment if it is necessary for the operator to pass that equipment for access or egress to the cab.
 "Note that the quoted section allows the option of locating electrical equipment so that live parts will not be exposed to accidental contact. In other words, open control panels and open resistors can be mounted in a location remote from operating personnel. One of the most common location(s) for this is the bridge walkway.
 "Since maintenance personnel would have to remove cover(s) or open doors in order to inspect or adjust devices, enclosures for this type of electrical equipment provide no additional protection for such personnel. In fact, the need to remove covers for inspection and adjustment introduces the possibility of additional hazards for personnel on the floor below if any loose parts should accidentally fall from the crane. It must also be realized that the power must be on and electrical devices exposed in order for the maintenance personnel to make proper adjustments to the crane. Therefore, whenever any maintenance personnel board a crane, this crane is no longer operating or performing functions within the scope of its intended original design."
 The opinion was issued in response to an inquiry by Bethlehem.
 
 
 [3]
 Compare, e. g., Secretary v. Bethlehem Steel Corp., OSAHRC Docket No. 9968 (Feb. 4, 1977) (decision below), with Secretary v. Wheeling Corrugating Co., OSAHRC Docket No. 13320 (Dec. 31, 1975), and Secretary v. United States Steel Corp., OSAHRC Docket No. 10825, 5 OSHC 1289 (Apr. 25, 1977)
 
 
 [4]
 Compare, e. g., Brennan v. OSHRC, 513 F.2d 713, 715-16 (8th Cir. 1975), with Diamond Roofing Co. v. OSHRC, 528 F.2d 645, 650 (5th Cir. 1976). See Marshall v. Western Elec., Inc., 565 F.2d 240, 245 (2d Cir. 1977)
 
 
 [5]
 In the United States Steel and Wheeling-Pittsburgh Steel cases, the Commission held that the regulation was not mandatory as to cranes installed before August 31, 1971 but was advisory only. It is our understanding that the two cranes in the case sub judice were installed before August 31, 1971. Under the Commission's later decisions, therefore, Bethlehem would not be in violation. We do not reach that issue here
 
 
 [6]
 Witness Pillock testified that when the crane is performing its material-handling functions, no one is permitted on the walkways except for trouble-shooting or other maintenance purposes. (138a, 150a, 151a). Normal production is not carried on while maintenance men are on the walkways, although obviously some malfunctions can be detected only when the cranes are operating
 The ALJ observed that Pillock testified he had been shocked by a resistor bank during the preceding year 20 or 25 times. However, the ALJ failed to note that the witness said specifically that he had never been shocked on crane 502. The testimony on this point, therefore, clearly had no value since it did not bear on the cranes involved in this case. Furthermore, Mr. Pillock's testimony does not reveal the circumstances in which he received the shocks.
 
 
 [7]
 The electrical foreman described the procedure when crane 560 was used as follows:
 "(W)e have to get permission to do this, to get the crane. This is a big project. We put bumpers and lights up, and these red lights are spread across from one runway to the next and it warns the cranes that are operating that we have bumpers and lights up and we are working on that crane, not to come down that area.
 "Our men will go out underneath a mercury vapor light that is out. They will have to position the main trolley where it's, they can put a ladder from the main trolley up to the light, and whenever they have everything in position, the power is pulled to the light, the power is pulled to the crane. They crawl up, they fix the, change the light bulb. Then the power is put back on to the light to see that the light is operating properly, and they come down off of the crane, off of the trolley, put their ladder away, put the switch back in, go take their bumpers and lights down."
 
 
 [1]
 The standard, under the general heading of "Overhead and gantry cranes," provides:
 (2) Equipment. (i) Electrical equipment shall be so located or enclosed that live parts will not be exposed to accidental contact under normal operating conditions.
 Bethlehem did not contest two other violations alleged in the August 19, 1974 citation.
 
 
 [2]
 54a-55a
 
 
 [3]
 Although the majority states (p. 161) that "When a repairman is undertaking maintenance operations, the crane is not being used for its intended purpose of lifting and moving heavy objects," I do not understand them to hold that the Administrative Law Judge's finding was unsupported by substantial evidence. Such a holding would not take account of the testimony of John Pillock, an electrical maintenance worker, that he has done maintenance and troubleshooting on both cranes while they are in production (126a, 146a, 150a-151a), and of Blair Ritchey, Bethlehem's supervisor, that from time to time, such trouble shooting and maintenance work coincides with production. (300-301a, 303a, 304a)
 
 
 [4]
 The Commission consisted of Chairman Barnako, and Commissioners Cleary and Moran. Chairman Barnako disqualified himself from consideration of this case
 
 
 [5]
 OSAHRC Docket No. 10825, 5 OSHC 1289 (April 25, 1977)
 
 
 [6]
 Id. at 1297
 
 
 [7]
 Id
 
 
 [8]
 Id. at 1301
 The majority makes reference to Secretary v. Wheeling-Pittsburgh Steel Corp., 5 OSHC 1495 (May 1977). While that case concerned the same standard at issue here, the Commission's ratio decidendi was that the regulation did not apply to the particular cranes in question. The Commission refrained from any interpretation of the scope of the protection afforded to workers on cranes covered by the regulation.
 Bethlehem's attempt to invoke the rationale of Wheeling-Pittsburgh for the first time on appeal would appear to be barred by 29 U.S.C. 660(a). See Keystone Roofing Co. v. OSHRC, 539 F.2d 960 (3d Cir. 1976).
 
 
 [9]
 513 F.2d 201 (3d Cir. 1975)
 
 
 [10]
 513 F.2d at 205
 
 
 [11]
 The majority distinguishes Budd on the ground that "we do not have an authoritative agency interpretation to assist us." p. 7. While it is true that the opinions of the Commissioners in United States Steel present a spectrum of views, it seems that Chairman Barnako's opinion is an "authoritative agency interpretation." First, it determined the outcome of the U.S. Steel case. More importantly, given the positions of Commissioners Cleary and Moran, it will authoritatively determine future cases, unless reversed by a court of appeals. In cases involving maintenance work while the crane is in production or where the exposure to hazard takes place in the course of changing light bulbs, Chairman Barnako will be supported by Commissioner Cleary. In other cases, he will be supported by Commissioner Moran
 Where, in addition, the protection extended by Chairman Barnako's opinion has the support of the Secretary of Labor, who promulgated the regulation, it seems that Budd Co. places a heavy burden on any one who would attempt to overturn the Commission's determination.
 
 
 [12]
 Majority opinion p. 161
 
 
 [13]
 58a
 
 
 [14]
 29 U.S.C. 651
 
 
 [15]
 29 U.S.C. § 655(a), under which the standard here at issue was promulgated, provides that "In the event of conflict among (national consensus) standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees." It seems that a corollary to such mandate is that in the case of a national consensus standard subject to more than one reasonable interpretation, the Secretary and the courts are adjured to adopt the more protective reading
 The majority describes the prospect of a maintenance person being shocked by exposed resistors as "unlikely and unforeseen." In view of the testimony, which was credited by the Administrative Law Judge, that one maintenance man had been shocked by a resistor bank between 20 and 25 times in the year before the hearing (53a), such a characterization of the hazard of being shocked by resistor banks would not seem to be tenable. In addition, there is testimony in the record that employees other than electrical maintenance workers used the walkways while the resistor banks were energized albeit in violation of Bethlehem's regulations. (135a-136a)
 
 
 [16]
 29 U.S.C. § 655(b)(1) provides:
 Whenever the Secretary, upon the basis of information submitted to him in writing by an interested person . . . determines that a rule should be promulgated (he may initiate procedures for promulgating such a regulation).
 In addition, under § 655(d), "Any affected employer may apply to the Secretary for a rule or order for a variance from a standard promulgated under this section."