**GENERAL ELECTRIC COMPANY,**
Petitioner,

*v.*

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent.**

No. 432, Docket 77–4137.

United States Court of Appeals,
Second Circuit.

Argued April 12, 1978.

Decided Aug. 16, 1978.

Stanley Schair, New York City (David L. Benetar, Roland C. Radice, Edward J. Cummings, Jr., Mark H. Leeds, Aranow Brodsky Bohlinger Benetar & Einhorn, Schenectady, N. Y., of counsel), for petitioner.

Eric W. Cloud, U. S. Dept. of Labor, Washington, D. C. (Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Acting Counsel for App. Litigation, U. S. Dept. of Labor, Washington, D. C., of counsel), for respondent.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

General Electric Company asks us to set aside a May 19, 1977, order of the Occupational Safety and Health Review Commission requiring the installation of a standard railing around the top of an oven in its Schenectady, New York, plant. The petition for review is made pursuant to § 11(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(a). We grant the petition, vacate the Commission's order, and set aside the citation upon which it is based.

General Electric is a New York corporation which employs more than 27,000 workers at its Schenectady plant. In October of 1974, an OSHA compliance officer inspected that portion of the Schenectady worksite known as the Small AC Motor Department. The next month, the Secretary of Labor issued eighteen citations for alleged violations of § 5(a)(2) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(2). These citations were contested by General Electric, and the matter was heard by Administrative Law Judge James Cronin, Jr., during March and April of 1975. Eventually, all but four of the citations were settled by the parties, and ALJ Cronin approved the settlement. One of the four unsettled citations forms the basis for this appeal.

Nestled among the various machinery of Building 81, Bay C18, of the Small AC Motor Department sits a "dip and bake" oven. Its purpose is to bake insulation onto small motors at certain stages of the manufacturing process. Although the record does not include a photograph of the oven, it is described as being approximately 10'8" tall with an L-shaped top; it is 20 feet long and 12 feet wide. On top of the oven are two circulation and exhaust motors which require occasional maintenance.[1] In order to reach the motors to perform this maintenance, a worker climbs a ladder permanently affixed to the side of the oven by its manufacturer. Once aloft, the worker walks along a six-foot section of non-skid grating, the length of which is guarded by a railing and toeboard.[2] One of the motors is adjacent to this railing, and when maintenance is being performed on it the worker stands approximately one foot from the edge of the oven top. The other motor is ten to fourteen feet from the end of the railing, but when this motor is being worked on the employee is almost four feet from the edge of the oven top.

The issue on this appeal is whether the unguarded portion of the top of the oven is a "platform" within the meaning of regulations promulgated by the Secretary of Labor. The OSHA inspection officer, the Administrative Law Judge, and the Commission each believed that it was and, accordingly, determined that General Electric had violated the Act by failing to guard the perimeter of the oven top with a "standard railing." We disagree.

## DISCUSSION

The purpose of the Occupational Safety and Health Act is "to assure so far as

---

1. Maintenance employee Anthony Perrone testified at the hearing that he had performed maintenance work on the top of the oven four or five times during the two and one-half years prior to the OSHA inspection.

2. As a result of a July 21, 1974, safety inspection by the union representing the employees at the Small AC Motors Department, General Electric installed a guardrail around this por-

tion of the top of the oven. The union had complained about an unguarded "catwalk" on the top of the oven and the company, without agreeing that the surface was a catwalk or that a guardrail was required, installed a six-foot railing and toeboard. Upon reinspection, the union made no further complaints about the safety of the oven top. This railing was present on the day of the OSHA inspection.

possible every working man and woman in the Nation safe and healthful working conditions . . .." 29 U.S.C. § 651(b). Section 5(a)(2) of the Act, the so-called "specific duty" clause, requires each employer to "comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a)(2).[3] The standard concerning "Protection of open-sided floors, platforms, and runways" provides as follows:

Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a toeboard wherever, beneath the open sides,

(i) Persons can pass,

(ii) There is moving machinery, or

(iii) There is equipment with which falling materials could create a hazard.

29 C.F.R. § 1910.23(c)(1).[4] "Platform" is defined as:

A working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment.

29 C.F.R. § 1910.21(a)(4). Because the oven top was regarded by the Secretary as a "platform" but was not guarded by a "standard railing" or its equivalent,[5] General Electric was cited for a violation of § 1910.23(c)(1).[6]

ALJ Cronin made the following observations regarding the question whether the unguarded portion of the oven top was a "platform" under the standards:

It reasonably may be argued that § 1910.23(c)(1) should be interpreted to apply only to elevated working spaces, 4 feet or [more] above ground level, which are designed primarily for the operation of machinery and equipment and which require employee presence on a predictable and regular basis; and not to spaces where only occasional maintenance or repair work is performed.

He determined, however, that the Commission's majority opinion in the case of *General Electric Co.*, OSHRC Docket No. 2739 (1975), "gave the broadest possible meaning to the term 'platform'" by suggesting "that an elevated area on any structure constitutes a platform whenever work is required to be performed thereon and sufficient protection from an existing falling hazard is not provided." Accordingly, he felt "constrained" to hold that the oven top was a

---

3. The Act is administered jointly by the Secretary of Labor and the Commission, each having separate and distinct responsibilities. The Secretary is responsible for the promulgation and enforcement of standards such as the one now under consideration, 29 U.S.C. §§ 655, 657, 658, 659(a). The Commission, on the other hand, is assigned the relatively limited role of administrative adjudication. 29 U.S.C. §§ 659(c), 661. Here, General Electric was cited for a "serious violation" of the Secretary's standards and assessed a penalty of $500. A "serious violation" exists when there is a "substantial probability that death or serious physical harm could result" from the presence of the violation. 29 U.S.C. § 666(j). ALJ Cronin determined that "[i]f an employee were to fall off the oven, he could suffer serious physical injury."

4. This Court has recently commented on "the Byzantine pattern of OSHA standards" having to do with "platforms," noting that "there is room for increased clarity of definition." *General Electric Co. v. OSHRC,* 540 F.2d 67, 70 n.2 (2d Cir. 1976). As evidenced by our decision

today, the pattern of the mosaic remains blurred.

5. A "standard railing" is defined as "[a] vertical barrier erected along exposed edges of a floor opening, wall opening, ramp, platform, or runway to prevent falls of persons." 29 C.F.R. § 1910.21(a)(6).

6. No citation was made based upon the so-called "general duty" clause of the Act, 29 U.S.C. § 654(a)(1), which requires employers to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." On this appeal our review is limited to the validity of the ground upon which the agency rested its decision, and we express no opinion on the impact of the general duty clause on the facts presented by this case. *See General Electric Co. v. OSHRC,* 540 F.2d 67, 69, 70 n.3 (2d Cir. 1976), *citing SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

"platform" and that a railing was required. *General Electric Co.*, OSHRC Docket No. 11344 (1975). In affirming this result, the three Commissioners made scant mention of this issue. Chairman Barnako's separate concurring opinion referred to the matter directly, but only to the extent of noting that the oven was used in General Electric's production operation and that the top of the oven was used for "normal maintenance work incident to [the production] operation." *General Electric Co.*, OSHRC Docket No. 11344 (1977) (Barnako, *Chairman*, concurring).

Our first concern in a case such as this is, of course, the determination of the standard of review we are to employ. As explained in *Marshall v. Western Electric, Inc., and OSHRC*, 565 F.2d 240, 244 (2d Cir. 1977), "this court has consistently held that its role 'is to decide whether the Commission's interpretation of the Regulation is unreasonable and inconsistent with its purpose, the normal standard for review of the interpretation of a regulation by the agency charged with its administration.'"[7] *See Brennan v. OSHRC and Gerosa, Inc.*, 491 F.2d 1340, 1344 (2d Cir. 1974); *Brennan v. OSHRC and Underhill Construction Corp.*, 513 F.2d 1032, 1038 (2d Cir. 1975). *See also Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). "The corollary to this proposition is that a court need not defer to an interpretation it finds unreasonable." *Langer Roof & Sheet Metal, Inc. v. Secretary of Labor and OSHRC*, 524 F.2d 1337, 1339 (7th Cir. 1975); *see General Electric Co. v. Gilbert*, 429 U.S. 125, 140–46, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Moreover, it has also been made clear that,

in considering the proper deference to be given to an administrative ruling, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *See also Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978); *Bethlehem Steel Corp. v. OSHRC and Marshall*, 573 F.2d 157, 160 (3d Cir. 1978). Here, although the Commission's consideration of the meaning of the term "platform" appears to have been relatively thorough, we find its reasoning in this case flawed and the result inconsistent with other pronouncements.

The regulation defines "platform" as "[a] working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment." 29 C.F.R. § 1910.21(a)(4). We do not read this definition to apply to every flat surface over four feet high upon which employees may some day stand while performing some task related to their employment and the operations of their employer. An elevated flat surface does not automatically become a "working space" and a "platform" merely because employees occasionally set foot on it while working. Had the authors of the regulation intended the term "platform" to include every elevated flat surface upon which employees could alight, they no doubt would have forgone the opportunity to limit the definition by using the phrase "such as a balcony or platform for the operation of

7. Although it has been suggested that courts of appeals should give even greater deference to an interpretation of a regulation that the Secretary and Commission agree on, *see, e. g., Wisconsin Electric Power Co. v. OSHRC and Secretary of Labor*, 567 F.2d 735, 738 (7th Cir. 1977); *International Union v. OSHRC*, 557 F.2d 607, 611 n.9 (7th Cir. 1977); *Irvington Moore, Division of U. S. Natural Resources, Inc. v. OSHRC and Marshall*, 556 F.2d 431, 434 (9th Cir. 1977) (Lumbard, J.); *Clarkson Construction Co. v.*

*OSHRC and Secretary of Labor*, 531 F.2d 451, 457 (10th Cir. 1976); *Budd Co. v. OSHRC*, 513 F.2d 201, 205 (3d Cir. 1975), Chief Judge Kaufman has recently noted that "where, as here, the Commission and the Secretary unite in an interpretation of a regulation within their joint sphere, the normal degree of judicial deference is appropriate." *American Airlines Inc. v. Secretary of Labor and OSHRC*, 578 F.2d 38, 39 n.1 (2d Cir. 1978).

machinery and equipment." The meaning of one term may be determined by reference to the terms it is associated with, and where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated. *See* 2A Sutherland, Statutory Construction §§ 47.16 (*noscitur a sociis*), 47.17 (*ejusdem generis*) (4th ed. 1973). We do not believe that infrequent, periodic maintenance of machinery is equivalent to the "operation" of that machinery, *cf. Bethlehem Steel Corp. v. OSHRC and Marshall, supra*, 573 F.2d at 161 (phrase "normal operating conditions" does not include maintenance operations), and so cannot agree with the Commission's conclusion that the oven top in this case is a "platform" so as to require a standard railing. As suggested by ALJ Cronin, a reasonable interpretation of § 1910.23(c)(1) is that it applies "only to elevated working spaces, 4 feet or [more] above ground level, which are designed primarily for the operation of machinery and equipment and which require employee presence on a predictable and regular basis; and not to spaces where only occasional maintenance or repair work is performed." As we believe is amply demonstrated by this case, to depart from this interpretation of the standard is to venture into unreasonableness.

The Commission, the Commission's Administrative Law Judges, and OSHA's compliance officers have been surprisingly inconsistent and unpredictable with regard to the definition of the term "platform." It can in no way be said that the result urged here by the Commission and the Secretary is based upon "a long-standing agency interpretation." *Brennan v. OSHRC and Gerosa, Inc., supra*, 491 F.2d at 1344. To the extent that consistency is discernible in the administrative and interpretive development of the term, it appears to favor the result we reach here.

The first important case to consider the definition of "platform" was *Ventre Pack-*ing Co., Inc., OSHRC Docket No. 396 (1973), the decision upon which Commissioner Barnako relied in the instant case. The Commission, per Commissioner Van Namee, determined that the roof of a walk-in cooler, which was being used as a storage space, would be a "working space" and hence a "platform" if it could be shown that workers had gone on to the surface to either store or retrieve materials. No such evidence had been presented, however, so no railing was required. Chairman Moran expressed his disagreement with what he regarded as dicta to the effect that mere employee presence on the roof would transform it into a "working space" and a "platform" so as to require a railing. Next came *California Rotogravure Co.*, OSHRC Docket No. 668 (1975). There, the Commission, again per Commissioner Van Namee, determined that an open-sided flat roof of an inside office, which was also being used as a storage space, was a "platform" that required a railing—work was performed on the roof, therefore it was a "working space," therefore it was a "platform." Commissioner Cleary joined in this result. Chairman Moran dissented. Using the same reasoning as he had in *Ventre Packing Co.*, he argued that the conclusion that "the roof of the office becomes a platform because employees set foot on it" was inconsistent with the purpose and the plain meaning of the standard and could serve only to draw within the ambit of the standard structures to which it was never intended to apply.

The decision which ALJ Cronin felt "constrained" to follow in this case came next. *General Electric Co.*, OSHRC Docket No. 2739, *rev'd in part on other grounds*, 540 F.2d 67 (2d Cir. 1976). There, the Commission, per Commissioner Cleary, determined that the broad provisions of 29 C.F.R. § 1910.252(e)(1)(i) [8] required an expansive reading of the term "platform" and held that a railing was required around the tops of items being manufactured because welders were required to work there.

---

**8.** The standard reads as follows:

A welder or helper working on platforms, scaffolds, or runways shall be protected against falling. This may be accomplished by the use of railings, safety belts, life lines, or some other equally effective safeguards.

[T]he purpose of the Act is to protect the health and safety of workers. This purpose is not well served by reading a standard in a manner that detracts therefrom. Here, this purpose is best served by a broad construction of the word "platform" in the standard.

The Commission also determined that a powered work platform that was used regularly by employees was a "platform." Commissioner Van Namee dissented because the sweeping use of the term "platform" could lead to preposterous results:

If [General Electric] is required to provide standard railings on its product because it is of such size that employees must be on it to manufacture it, then any other employer similarly situated can also be required to erect guardrails on its product while it's being manufactured. For example, [this] rule will require the erection of guardrails on the wings, tail assemblies and fuselages of large aircraft being manufactured. Other equally monstrous modifications of product design can be easily imagined.

That case was decided after the OSHA inspection that led to this appeal.

In 1976 the Commission decided the case of *Allis-Chalmers Corp.*, OSHRC Docket No. 5210 (1976). Commissioner Moran wrote as follows:

Although the evidence establishes that respondent's employees used the transformer tops as "working space[s]," we conclude that the mere use of a structure as such does not establish that it is a platform. The definition also indicates that the words "work space" refer to such things as a balcony or platform "for the operation of machinery or equipment." In my opinion, this specific language restricts the definition of "platform" to a structure that is erected to accomplish work that is being performed.

Chairman Barnako agreed in the result, but declined to join Commissioner Moran's restrictive definition of the term "platform." Commissioner Cleary dissented, citing *Gen-*

*eral Electric Co.*, *supra*, and describing as "crucial" the fact that the open-sided surfaces in question were "regular working surfaces" for the employees. In *Weyerhaeuser Co.*, OSHRC Docket Nos. 1231, 1758 (1977), the other case upon which Chairman Barnako relied in his concurring opinion in the instant dispute, Chairman Barnako and Commissioner Cleary determined that an elevated surface used regularly by workers as a place from which they could saw off protruding ends of lumber was a "platform" that required a railing. They distinguished between "a maintenance problem" which required employee presence on the surface and the "usual work practice" of requiring employees to go onto the "platform" as a normal part of the production process. The two Commissioners relied not on the occasional presence of workers for maintenance purposes but on the regular and required presence of workers for normal production purposes to reach the conclusion that a railing was required. Commissioner Moran dissented.

More recently, prior to the appointment of Commissioner Cottine and while there were only two members of the Commission, Chairman Cleary and Commissioner Barnako have acknowledged their disagreement on the breadth of the term "platform." *Simmons, Inc.*, OSHRC Docket No. 12862 (1977); *Prowler Travel Trailers of New York, Inc.*, OSHRC Docket No. 15636 (1977). In *Simmons*, Chairman Cleary expressed his belief that when a worker is required to do repair work on the top surface of a machine two or three times weekly, that surface is a "platform" that requires a railing. Commissioner Barnako, on the other hand, argued that not every surface upon which an employee may stand while performing work is a "platform" within the meaning of the standard, citing as an example *Whirlpool Corp.*, OSHRC Docket No. 9224 (1977). *See also Union Carbide Grafito, Inc.*, OSHRC Docket No. 7368 (1975). As defined by Commissioner Barnako, a "platform" would include only those surfaces used for the operation of machinery and equipment.[9]

---

**9.** The cases discussed in the text are, in our opinion, only the more important cases on point; there are others, all of which demonstrate not only the confusion generated by the

Thus, we are neither bound nor persuaded by the opinions of the Secretary and the Commission that the top of General Electric's dip and bake oven is a "platform" for purposes of § 1910.23(c)(1). We acknowledge that "[t]he keystone of the Act . . . is preventability." *Brennan v. OSHRC and Underhill Construction Corp.,* supra, 513 F.2d at 1039. And, as recently noted by this Court, "[w]e recognize that OSHA's efforts have contributed significantly to the health and welfare of our nation's work force." *American Air Lines, Inc. v. Secretary of Labor and OSHRC,* 578 F.2d 38, 39 (2d Cir. 1978). But, apparently, the Secretary and the Commission need to be reminded on occasion of their responsibility to be "reasonable"—this is such an occasion. Along these lines, the Third Circuit has recently made the following observation:

> The purpose of OSHA standards is to improve safety conditions in the working place, by telling employers just what they are required to do in order to prevent or minimize danger to employees. In an adjudicatory proceeding, the Commission should not strain the plain and natural meaning of words in a standard to alleviate an unlikely and uncontemplated hazard. The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and the obligation to amend.

*Bethlehem Steel Corp. v. OSHRC and Marshall,* supra, 573 F.2d at 161. Similarly, the Fifth Circuit has offered the following comments:

term "platform" but also the single thread of continuity that we have been able to discover— whenever a "platform" has been found to exist, workers have been assigned to do work on that surface with some regularity and the nature of the work assigned has been central to the processes of the employer. We have found no case where a worker's presence on a flat surface merely for the performance of infrequent maintenance functions has been used as a basis for holding such a surface to be a "platform." *See generally Arizona Public Service Co.,*

If the regulation missed its mark, the fault lies in the wording of the regulation—a matter easily remedied under the flexible regulation promulgating structure . . . with no need to press limits by judicial construction in an industrial area presenting infinite operational situations.

.    .    .    .    .

To strain the plain and natural meaning of words for the purpose of alleviating a perceived safety hazard is to delay the day when the occupational safety and health regulations will be written in clear and concise language so that employers will be better able to understand and observe them.

*Diamond Roofing Co. v. OSHRC and Usery,* 528 F.2d 645, 648–50 (5th Cir. 1976) (citations and footnote omitted). Finally, the Seventh Circuit has noted:

> It may well be, as the Secretary urges, that employees working on a flat roof require perimeter protection. If this be so, the Secretary has the machinery available to amend the section in question or to promulgate an entirely new section that would lay the matter to rest. It appears to us that the time and effort— not to mention the expense—of the notice and hearing required for such regulation changes would be far less than the effort and expense of the instant case.

*Langer Roof & Sheet Metal, Inc. v. Secretary of Labor and OSHRC,* supra, 524 F.2d at 1339. We share these sentiments.

Simply put, to apply this standard to the surface here in question would go too far— it would be inconsistent with the wording of the standard and it would create considerable doubt that the standard provides

OSHRC Docket No. 329 (1972) (Burchmore, ALJ); *U. S. Homes, Inc., Sandler-Bilt Division,* OSHRC Docket No. 367 (1972) (Harris, ALJ); *Kidets, Inc.,* OSHRC Docket No. 2670 (1973) (Dern, ALJ); *George A. Hormel & Co.,* OSHRC Docket No. 1410 (1974); *Alan B. Sibley Mill, Deering-Milliken Inc.,* OSHRC Docket No. 8927 (1975); *General Electric Co.,* OSHRC Docket No. 76–2879 (1977) (Gold, ALJ); *General Electric Co.,* OSHRC Docket No. 76–3524 (1977) (Weil, ALJ).

to employers fair warning of the conduct which it prohibits or requires. *See Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952). *See also CTM, Inc. v. OSHRC and Marshall*, 572 F.2d 262, 264 (10th Cir. 1978); *Wisconsin Electric Power Co. v. OSHRC and Secretary of Labor*, 567 F.2d 735, 740–41 (7th Cir. 1977) (Pell, J., dissenting); *Diamond Roofing Co. v. OSHRC and Usery, supra,* 528 F.2d at 649. *Compare McLean Trucking Co. v. OSHRC and Secretary of Labor*, 503 F.2d 8, 10–11 (4th Cir. 1974); *Ryder Truck Lines Inc. v. Brennan*, 497 F.2d 230, 233 (5th Cir. 1974). The petition for review is granted, the Commission's order is vacated, and the citation is set aside.[10]

---

10. Because of our disposition of this case, we need not and do not reach the question whether the Secretary failed to show a violation of the cited standard within the six-month limitation period. *See* 29 U.S.C. § 658(c).